1   MARC MARMARO, SBN 85242
    *mmarmaro@jmbm.com*
2   AMY LERNER HILL, (SBN, 216288
    *akl@jmbm.com*
3   JEFFER, MANGELS, BUTLER & MARMARO LLP
    1900 Avenue of the Stars, Seventh Floor
4   Los Angeles, California 90067-4308
    Telephone: (310) 203-8080
5   Facsimile: (310) 203-0567

6   *Attorneys for Defendant Religious Technology Center*

7   BERT H. DEIXLER, SBN 070614
    *bdeixler@proskauer.com*
8   HAROLD M. BRODY, SBN 84927
    *hbrody@proskauer.com*
9   PROSKAUER ROSE LLP
    2049 Century Park East, 32nd Floor
10  Los Angeles, CA 90067-3206
    Telephone: (310) 557-2900
11  Facsimile: (310) 557-2193

12  ERIC M. LIEBERMAN, admitted pro hac vice
    *elieberman@rbskl.com*
13  RABINOWITZ, BOUDIN, STANDARD,
      KRINSKY & LIEBERMAN, P.C.
14  111 Broadway, 11th Floor
    New York, NY 10006

15
16  Attorneys for Defendant *Church of Scientology International*

17              UNITED STATES DISTRICT COURT

18              CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 19  CLAIRE HEADLEY, | CASE NO.  CV 09-3987 DSF (MANx) |
| 20            Plaintiff, | **RTC'S & CSI'S JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF** |
| 21       v. | **MOTION FOR SUMMARY JUDGMENT ON REMAINING CLAIMS AND FOR SUMMARY ADJUDICATION OF ISSUES** |
| 22  CHURCH OF SCIENTOLOGY INTERNATIONAL, a corporate entity; RELIGIOUS TECHNOLOGY | |
| 23  CENTER, a corporate entity, and DOES 1 through 20, | Hon. Dale S. Fischer |
| 24 | |
| 25            Defendants. | Date:    July 26, 2010 |
| 26 | Time:    1:30 p.m.<br>Dept:    840 |
| 27 | |
| 28 | |

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

FACTS ..............................................................................................3

    1.   FACTS CONCERNING THE SCIENTOLOGY RELIGION, THE SEA ORG, AND SCIENTOLOGY ETHICS AND JUSTICE SYSTEM..........................................3

    2.   CLAIRE HEADLEY: "STRAIT-LACED" SEA ORG MEMBER, COMMITMENT TO RTC, LIVING ARRANGEMENTS, FREEDOM OF MOVEMENT, AND LEAVING. .............................................................8

    3.   CLAIRE HEADLEY'S TWO ABORTIONS. ........................17

ARGUMENT ...................................................................................18

I.   SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING PLAINTIFF'S TVPA CLAIM FOR "FORCED LABOR" .........................18

   A.   The Ministerial Exception Precludes Application of the TVPA to the "Employment" Relationship Between a Church and its Ministers, and In Particular Between Headley and CSI and RTC .....20

   B.   Even if TVPA Could Be Applied to Narrow Circumstances of Actual or Threatened Physical Restraint, Headley's Fear That She Would Be Subject to Excommunication If She Left Golden Era or RTC Cannot Be the Basis of a Forced Labor Claim...........................24

   C.   Even if TVPA Could Be Applied to Narrow Circumstances of Actual or Threatened Imminent Physical Restraint, Defendants' Imposition or Threatened Imposition of a Restricted Lifestyle and of Church Discipline Upon a Sea Org Member Cannot Be the Basis of a Forced Labor Claim .........................................................25

   D.   The Religious Freedom Restoration Act Bars Plaintiff's TVPA Claim...........................................................................................32

- i -

E.    The Court Should Summarily Adjudicate That Headley's Participation In The Lifestyle Of The Sea Org And CSI's and RTC's Implementation Of Ecclesiastical Discipline Cannot Support A TVPA Claim Against A Church Involving Its Ministers..33

II.    PLAINTIFF LACKS STANDING UNDER THE CAL. BUS. & PROF. CODE AND UNDER ARTICLE III OF THE CONSTITUTION TO SEEK INJUNCTIVE RELIEF AGAINST DEFENDANTS' ALLEGED POLICY CONCERNING ABORTIONS BECAUSE SHE DID NOT SUFFER LOSS OF PROPERTY OR MONEY AND BECAUSE CANNOT SHOW A DEFINITIVE LIKELIHOOD OF FUTURE HARM TO HERSELF FROM THE ALLEGED CONDUCT ....................36

CONCLUSION ..................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alcazar v. Corp. of the Catholic Archdiocese of Seattle,*
  598 F.3d 668 (9th Cir. 2010) ...................................... 1, 14, 20, 21, 22, 31, 34, 35

*Armstrong v. Davis,*
  275 F.3d 849 (9th Cir. 2001) ........................................................................... 38

*Brandenburg v. Ohio,*
  395 U.S. 444 (1968) ......................................................................................... 24

*Bushnell v. VisCorp.,*
  1996 WL 506914 (N.D. Cal. Aug. 29, 1996) ................................................... 35

*Deitz v. Comcast Corp.,*
  2006 WL 3782902 (N.D. Cal. Dec. 21, 2006) ........................................... 38, 39

*DiSandro v. Makahuena Corp.,*
  588 F. Supp. 889 (D. Haw. 1984) .................................................................... 34

*EEOC v. Catholic Univ. of Am.,*
  83 F.3d 455 (D.C. Cir. 1996) .......................................................................... 33

*First Nat'l Ins. Co. v. FDIC,*
  977 F. Supp. 1051 (S.D. Cal. 1997) ................................................................ 35

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.,*
  528 U.S. 167 (2000) ........................................................................................ 38

*Gest v. Bradbury,*
  443 F.3d 1177 (9th Cir. 2006) ................................................................... 38, 39

*Gitlow v. New York,*
  268 U.S. 652 (1925) (Holmes, J., dissenting) .................................................. 23

*Gonzales v. O Centro Espirita Beneficente Uniao
  do Vegetal,* 546 U.S. 418 (2006) .................................................................... 33

*Hodgers-Durgin v. de la Vina,*
  199 F.3d 1037 (9th Cir. 1999) ......................................................................... 39

*Lies v. Farrell Lines, Inc.,*
  641 F.2d 765 (9th Cir. 1981) ........................................................................... 34

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ........................................................................................ 38

*NAACP v. Claiborne Hardware,*
  458 U.S. 886 (1982) ........................................................................... 23, 24, 35, 36

- i -

*Navajo Nation v. U.S. Forest Serv.*,
   535 F.3d 1058 (9th Cir. 2008) ................................................................. 33

*NLRB v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979) .................................................................................. 21

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) .................................................................................. 38

*Org. for a Better Austin v. Keefe*,
   402 U.S. 415 (1971) .................................................................................. 23

*Orlando v. Alamo*,
   646 F.2d 1288 (8th Cir. 1981) ........................................................... 24, 30

*Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.*,
   819 F. 2d 875 (9th Cir. 1987) ..................................................... 24, 27, 30

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) (concurring) ............................................................ 27

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) ..................................................................... 26, 27, 35

*Stickrath v. Globalstar, Inc.*,
   527 F. Supp.2d 992 (N.D. Cal. 2007) ..................................................... 38

*United States v. Calimlim*,
   538 F.3d 706 (7th Cir. 2008) ................................................................... 26

*United States v. Kaufman*,
   546 F.3d 1242 (10th Cir. 2008) ............................................................... 26

*United States v. Marcus*,
   487 F. Supp. 2d 289 (E.D.N.Y. 2007),
   *vacated on other grounds*, 538 F.3d 97 (2d Cir. 2008) ........................... 26

*United States v. Sabhnani*,
   599 F.3d 215 (2d Cir. 2010) .................................................................... 26

*Van Schaick v. Church of Scientology, Inc.*,
   535 F. Supp. 1125 (D. Mass. 1982) ........................................................ 24

*Worldwide Church of God v. Phila. Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) ................................................................. 33

**STATE CASES**

*Gunn v. Mariners Church*,
   167 Cal. App. 4th 206 (2008) .................................................................. 28

*Higgins v. Maher*,
   210 Cal. App. 3d 1168 (1989) ..................................................... 22, 27, 28

- ii -

*Meroni v. Holy Spirit Ass'n,*
  506 N.Y.S.2d 174 (N.Y. App. Div. 1986)........................................................ 29, 32

*Peterson v. Cellco Partnership*
  164 Cal.App.4th 1583 (2008) ........................................................................ 37

*Troyk v. Farmers Group, Inc.,*
  171 Cal.App.4th 1305 (2009) ........................................................................ 37

**FEDERAL STATUTES**

18 U.S.C.
  § 1589........................................................................................ 18, 20, 22
  § 1593............................................................................................... 21
  § 1593(b)(3) ......................................................................................... 21
  § 1595................................................................................... 18, 20

42 U.S.C.
  § 2000bb-1(b).......................................................................... 32
  § 2000bb-1(c) .......................................................................... 33
  § 2000bb-3(a), (b)..................................................................... 33
  §§ 2000bb *et seq.* ................................................................ 2, 32

Fed. R. Civ. P. 56(b)...................................................................... 34, 35

**CALIFORNIA STATUTES**

Bus. & Prof. Code § 17204............................................................ 37

California Bus. & Prof. Code §17200, et seq. .......................................... 1

8086/21051-004 Current/19060662v1

JMBM | Jeffer Mangels
Butler & Marmaro LLP

**INTRODUCTION**

Defendants submit this joint memorandum in support of their motion for summary judgment dismissing plaintiff Claire Headley's remaining two causes of action: (1) A claim for violation of the federal forced labor statute providing for a civil cause of action; (2) A claim for injunctive relief, under California's unfair business practice statute, to enjoin defendants from enforcing an alleged policy of forcing female members of the Sea Organization ("Sea Org") to have abortions.

On April 2, 2010, this Court granted Defendants' joint motion for partial summary judgment on plaintiff's first cause of action alleging a minimum wage/maximum hour claim under California Bus. & Prof. Code §17200, et seq. (Docket No. 100.)  Relying on *Alcazar v. Corp. of the Catholic Archdiocese of Seattle,* 598 F.3d 668 (9th Cir. 2010), this Court held that Claire Headley was a "minister" within the meaning of the "ministerial exception" and the First Amendment, and that therefore her labor on behalf of Church of Scientology International ("CSI") and Religious Technology Center ("RTC") was not covered employment under federal and state wage and hour laws.

Summary judgment should now be granted dismissing Plaintiff's third cause of action for "forced labor."  Like her husband, Claire Headley had ongoing, numerous and lengthy opportunities to leave during the time she performed her religious duties and responsibilities for Golden Era and RTC, including living in her own apartments and houses off the premises of the International Base ("the Base"), having access to transportation and cell phones, attending to personal and professional needs by frequently traveling around the Los Angeles area, visiting family and friends, going on recreational trips, and otherwise.  She admits that for years she was a committed Scientologist and Sea Org member and a high level executive at RTC, where she carried out religious duties that she described as a "police function" to insure that others on the Base were properly carrying out their religious duties, and that she only

- 1 -

1   left after she was removed from her position at RTC and her husband unilaterally left

2   without telling her.  In fact, Ms. Headley attempted to recruit her siblings into the Sea

3   Org in the hope that they would be able to join her on the International Base.  She

4   claims she did not leave earlier despite almost daily opportunities to do so for a

5   variety of reasons, including that she purportedly had nowhere else to go and nothing

6   else she could do, and that she feared she would suffer religious discipline in the form

7   of dis-fellowship from other Scientologists, including her husband and other

8   members of her family.  Plaintiff's attempt to assert a cause of action under the

9   federal forced labor statute based upon the facts and circumstances of her

10  participation in the religious life and commitment of the Sea Org, including "the

11  lifestyle constraints that come with being a member of the Sea Org" (*Claire Headley*

12  Order at 4-5), must be rejected under the ministerial exception, the First Amendment,

13  and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*

14      Plaintiff's second cause of action for injunctive relief, pursuant to Cal. UCL §

15  17200, et seq., against defendants' alleged "forced abortion" policy, which she asserts

16  caused her to have two abortions in the mid-1990s, also must be dismissed.  Plaintiff

17  lacks standing to seek injunctive relief for two reasons:  (1) she suffered no loss of

18  property or money, a prerequisite for invoking Cal. UCL; and (2) she has not been

19  associated with defendants for over five years, is not subject to their control, and

20  cannot show a definitive likelihood of future harm, as is required to assert a claim for

21  injunctive relief under Article III of the Constitution.  Moreover, the undisputed facts

22  show that plaintiff underwent two abortions because she did not want to leave the Sea

23  Org or her staff positions with CSI and RTC (the very positions she also claims

24  constituted "forced labor"), and that defendants have no "forced abortion" policy but

25  rather insist that the rigorous life of a Sea Org member requires that membership be

26  reserved for those without the responsibility to rear young children.  That policy is

27  protected by the First Amendment and the ministerial exception.

28

- 2 -

## FACTS

Defendants have set forth an extensive discussion of many of the material and relevant facts in their first motion for partial summary judgment which the Court granted on April 2, 2010. We will not repeat here all the facts previously discussed, although, to make the record on this motion complete and unitary, many are included in the Separate Statement. In this Brief, we summarize some of those facts most pertinent to the issues raised by this motion, and address certain additional undisputed facts that support it and compel that it be granted.

1. **Facts concerning the Scientology religion, the Sea Org, and Scientology ethics and justice system.**

All CSI and RTC staff belong to the Scientology religious order known as the Sea Organization, or Sea Org. (SUF 4.) To qualify to join the Sea Org, a Scientologist must undertake extensive training and study, pass a fitness examination, and receive certification that he or she is qualified for the rigors of Sea Org life. (SUF 2.) Sea Org members sign a symbolic commitment of one billion years, reflecting their dedication to service in furtherance of the Scientology religion and the salvation of humanity and their awareness of themselves as immortal spiritual beings. Because of this commitment, it is exclusively from the Sea Org that the senior leadership of Scientology is drawn, including the entire staff of senior management and Advanced Scientology churches. (SUF 1, 5.) They subscribe to *The Code of the Sea Org Member*, which contains vows that are repeated at Sea Org ceremonies that take place annually. (SUF 6.)

Before joining the Sea Org, potential members are told that they will be required to work long and hard hours without material compensation, and that they may be assigned or reassigned anywhere in the world to further the goals and expansion of the Scientology religion. (SUF 7.) They share tradition and lifestyle. They wear uniforms when on duty and have a merit-based maritime rank and rating system and etiquette. Sea

- 3 -

1   Organization members live communally and eat in common dining halls.  All living

2   necessities are provided.  (SUF 3.)

3        Sea Org members are held to the highest ethical standards of the Scientology

4   religion.  They are expected to study and comply strictly with Scientology's system of

5   ethics and justice.  (SUF 156.)  Scientology posits that only individuals who are acting

6   according to proper ethical precepts can advance spiritually, and, indeed, unethical

7   behavior can impede the spiritual progress not only of the individual but also, if the

8   individual is a church staff member, of the church itself.  (SUF 151.)  If a Sea Org

9   member acts outside the ethical principles, he/she may be subject to ecclesiastical

10  discipline.  The form of discipline varies on a gradient in proportion to the seriousness of

11  the offense, from a verbal warning or rebuke, to temporary loss of privileges, removal

12  from post and assignment to a post with less responsibility, manual labor such as kitchen

13  duty, gardening, etc., to expulsion from the group.  (SUF 157.)  Serious offenses are

14  brought before a committee of evidence consisting of other Sea Org members in good

15  standing.  (SUF 158, 159.)  If a Sea Org member is found to have committed serious

16  ethical violations that justify expulsion, he/she may be offered the option of participation

17  in a program of spiritual rehabilitation, called the Rehabilitation Project Force ("RPF").

18  (SUF 160.)  (Neither Marc nor Claire Headley ever participated in the RPF.  (SUF 161-

19  62.))  RPF members engage in religious study and auditing and physical labor.  After one

20  "graduates" from the RPF, he/she will resume a Sea Org position.  No one is forced to

21  participate in the RPF; if one refuses, he/she simply will be expelled from the Sea Org

22  and from all staff positions, and, depending on the nature of the ethical violation, perhaps

23  the church.  (SUF 160.)  Such lifestyle restrictions and ecclesiastical discipline, about

24  which every Sea Org members knows, are common to religious orders.  See Flinn

25  Decl., in particular ¶¶ 11-15, 17, 19, 28, and 39.[1]

26  

27       [1] We submit Dr. Flinn's declaration with this motion.  Among his observations,
    Dr. Flinn notes that "The rules of [Buddhist] monastic life are all encompassing.
28                                                  (footnote continued . . .)

- 4 -

JMBM | Jeffer Mangels
      Butler & Marmaro LLP

1   Scientology Scriptures provide an accepted procedure, called "Routing Out", by

2   which a Sea Org member may withdraw his/her vows and leave the Sea Org, while

3   still maintaining a relationship with Scientology churches and religion.  A person

4   who has routed out becomes a "public" Scientology parishioner.  The process

5   involves submission of a "leaving staff" routing form, participation in ethics and

6   justice procedures, including confessionals, and can take several weeks or even

7   months. (SUF 163.)  While participating in the process, a Sea Org member is

8   excused from his/her post, but is expected to continue to contribute by performing

9

10   They govern ... what punishments are to be meted out for breaking the rule"; that for

11   most rules infractions "the community sits in judgment on the offender and,
    depending on the case, either imposes a penance for improvement or expels a

12   repeating offender.  The procedural regulations are very elaborate. ..."; "As with
    Christian monks and nuns, a member must seek a superior's permission to leave the

13   monastery and is obliged to report in on returning. ... [E]very aspect of the member's

14   life — dwelling, periods of study and meditation, food, clothing, manner of begging,
    contact with nuns and lay people, food, medicines, etc. — is closely supervised and

15   monitored;" "Even humble tasks — such as weeding the garden, baking bread,

16   sweeping the monastery paths, cleaning the latrines — are understood in a religious
    way.  These ordinary duties contribute to the monastic's developing attitudes of

17   humility, modesty, and obedience, without which their progress in the stages of

18   meditation leading to enlightenment and the spread of the Buddhist ideal would be
    impaired or thwarted...."; [The Catholic] Rule of St. Benedict has detailed steps for

19   disciplining and excommunicating or readmitting erring monks and nuns who have

20   fallen away from the rules of the order....  The punishments include kneeling with
    outstretched arms for long periods, silencing, mortification by self-flagellation with a

21   whip or wearing a hairshirt, solitary meals, physical discipline, and, as a last resort,

22   outright expulsion ....  An excommunicated member is understood to be one who
    foregoes salvation and risks the fires of an everlasting hell.  Members who associate

23   with an excommunicated member without direction of the abbot or abbess are liable

24   to receive the same punishment."; "The monks or nuns settle the affairs of the daily
    life in the monastery, including the public confession of sins and infractions against

25   the rule.  Sinning members are usually sent before special supervisory committees of

26   other monks or nuns who determine what sort of discipline or punishment befits the

27   offense." (Flinn Decl., ¶¶ 13, 15, 17, 19, 28.)

28                                          - 5 -

1   chores, such as gardening, cooking, cleaning, etc.  Numerous Sea Org members have

2   chosen to route out due to changes in their life, while remaining Scientologists in

3   good standing.  (SUF 164.)  These procedures are part of "the lifestyle constraints

4   that come with being a member of the Sea Org."  (*Claire Headley* Order at 4-5.)

5      If a Sea Org member chooses to leave without routing out, other Sea Org

6   members may attempt to convince or persuade him/her to stay or to return; such

7   efforts are a natural and inevitable outgrowth of the belief among Sea Org members

8   that they are attempting to achieve the salvation of the individual and the clearing of

9   the planet.  Such efforts sometimes have included locating the person who left, and

10  attempting to meet and/or discuss with him/her the reasons for leaving and to

11  convince the person to return.  If the person insists on leaving or refuses to return,

12  without routing out, he/she may be subject to ecclesiastical discipline, including, but

13  not necessarily, being declared a "suppressive person", which is the functional

14  equivalent of being shunned or excommunicated.[2]  (SUF 165.)

15

16      [2] Such practices are also typical of religious orders.  As described by Dr. Frank
    Flinn:

17

18      As Roman Catholic monks and friars take solemn, as opposed to regular or
    temporary vows, they must first obtain what is called a dispensation (from their

19      vows) from the Vatican itself.  They maintain their good relation with the
    official church provided that they observe proper procedures in exiting, wait

20      until the dispensation is finalized according to canonical regulations, and do
    not heap scorn on their mother church.  If they fail to fulfill these precepts they

21      are liable to censure, interdict (an exclusion from all sacraments such as
    Marriage, Reconciliation (Confession), the Eucharist and Anointing) and/or

22      excommunication, a total separation from the church and its fellowship.

23

24  (Flinn Decl., ¶ 29.)

25      Should a member [of a Buddhist religious order] take flight in untoward
    circumstances — whether having committed a serious infraction ... or simply

26      depart in an unvetted manner — their fellow monks and nuns would seek to

27      bring them back to straighten matters out in a canonical manner.  The reason is
                                                    (footnote continued . . .)

28                                    - 6 -

JMBM | Jeffer Mangels Butler & Marmaro LLP

As a result of the rigorous lifestyle and restraints of the Sea Org, the churches concluded that it was both unfair to parents and children and unworkable for the Sea Org for Sea Org members to bear the responsibilities of caring for and raising young children. (SUF 166.) Thus, in 1986, CSI promulgated a policy that from that point forward, Sea Org members who wished to have children would be required to route out of the Sea Org, and, if they wished, work in one of the many local churches of Scientology whose staff members were not required to live such a rigorous lifestyle. (SUF 167.) The order stated:

> [A] Sea Org member is expected to be able to accomplish any action required, and may be called on at a moment's notice to serve . . . at any location on the planet. These facts have occasionally caused hardship for Sea Org members who are parents, and sometimes also for their children…The Sea Org is a tough, dedicated organization which requires all of its members to be fully on post – not troubled with [family responsibilities].

(SUF 168.)

In April 1991 a second order reiterated the policy and the reasons for it, and required that a pregnant member must be permitted to complete the routing out process in no less than 60 days (SUF 169.)

After summarizing these attributes of the Sea Org, Dr. Flinn concludes that "[t]his level of commitment is typical of religious orders throughout history" and that the Sea Org has all the attributes of religious orders around the world:

> All of these types of religious activities Scientology shares with members of religious orders around the world. This spiritual communal life allows the Sea Organization to fulfill its high religious mission, the preservation and

> simple to the believer: to simply "cut and run" would be to expose oneself to the frightful condition of foregoing *moksha* in this lifetime. (*Id.,* ¶ 17.)

- 7 -

1   transmission of the teachings of L. Ron Hubbard and the careful and exact

2   preservation and delivery of the training and auditing technology.

3   (Flinn Decl. ¶37, SUF 3.)

4       2.    **Claire Headley: "Strait-laced" Sea Org Member, Commitment to**

5               **RTC, Living Arrangements, Freedom of Movement, and Leaving.**

6        Claire Headley's mother was a Sea Org member when Claire was a child, and

7   remains a Scientologist to this day.  Claire's stepfather also was and is a

8   Scientologist. (SUF 8.)  Like most children of other faiths, she was raised in the faith

9   of her parents, and was taught and accepted the theology and doctrine of the

10  Scientology religion. (SUF 9.)  At the age of 16, with her parents' written

11  permission, she joined the Sea Org. (SUF 1.)  She understood at the time what the

12  lifestyle of a Sea Org member entailed, including wearing uniforms, living

13  communally, working long hours, and receiving a small allowance, because her

14  mother, uncle and cousins had all been Sea Org members, and it was "pretty much all

15  I knew as a lifestyle." (SUF 10.)  Indeed, Claire's mother even had once accepted an

16  assignment to the RPF, so Claire was well aware of the strict disciplinary code

17  applied to Sea Org members. (SUF 11.)  Upon joining, she signed a declaration of

18  religious commitment to the Sea Org, which stated that she volunteered "to create a

19  better world" for a symbolic one billion years, "not in contemplation of receiving any

20  compensation whatsoever, and . . . forsaking all commercial and financial

21  motivation." (SUF 12.)  She restated this commitment to the Sea Org and the religion

22  upon becoming a staff member of RTC in 1996. (SUF 22.)

23       Headley remained a member of the Sea Org until she left the Church in January

24  2005. (SUF 13.)  During that period, she believed she was furthering the goals of

25  Scientology.  She believed that the purposes of the Sea Org included to "clear the

26  planet." (SUF 14.)  She regularly recited the Code of a Sea Org Member at

27  ceremonies that took place annually. (*Id.*)  Headley acknowledged that she remained

28

- 8 -

a committed Sea Org member for many years, eventually had doubts and lost her commitment, and left the first and only time she attempted to do so.  In fact, she believed in Scientology until she left in January 2005.  (SUF 113.)  During that time, she served the religion and believed that she was furthering its goals.  (SUF 14.)  She had been raised to believe "that it was wrong not to be in the Sea Org and that people that left were out-ethics criminals and various other things along the same line of thought….  That's how I was raised, and I was doing what I was raised to believe was right," specifically, "that joining the Sea Org and being a Sea Org member is the correct thing to do."  (SUF 15.)  She had been "firmly raised in that for [her] whole life…" (*Id.*)  As her husband describes her, Claire Headley "was a real strait-laced Sea Org member" who was "proud" of her husband and "happier" when he was promoted to a more "respectable position" as a Sea Org member.  (SUF 33.)  And therefore, "it took a fair bit to make me actually get to the point of leaving because I was very firmly connected, and I knew absolutely nothing else."  (SUF 16.)  It was not one event, but "many events over a course of several years", most significantly her husband's departure without her, that led her to depart.  (SUF 16, 133.)

Indeed, so committed was Claire Headley to the Sea Org and to her positions in RTC at the International Base that she strenuously attempted to recruit her younger siblings to join the Sea Org and, Claire hoped, work with her at the International Base.  As Claire testified, in the early 2000s, it was Claire's "idea" to "encourage" her sister Kirsten to join the Sea Org "because [she] would have liked to work with her" at the Gold Base.  (SUF 45.)  Kirsten confirms that Claire made several efforts to recruit her to work at the Base:

> From time to time, when I was in high school, Claire talked to me about joining the Sea Org myself and encouraged me to join and work with her. Claire told me in 2002 or 2003, I believe, that she already "had a place for me" as in she had a desk or a space ready for me once I joined the Sea Org

- 9 -

1  where she worked at RTC . . . I remember talking to her about how the food

2  was there, she told me that there were a lot of options for breakfast - eggs,

3  cereals, fruit etc, and that everyone ate in a big dining hall. She was very

4  upbeat about her work and seemed to very much want me to join her as a

5  member of the Sea Org.

6  (SUF 45-46.)

7  Claire also recruited her brother Robert to join the Sea Org. (SUF 48.) As he

8  describes it, in 2002:

9  I spoke to Claire on the telephone, and told her that I was thinking of joining the

10  Sea Organization myself some day. Claire was very excited about this and

11  arranged to have a long telephone conversation with me to tell me about it. In

12  the call, Claire was very encouraging to me to join the Sea Org, and told me that

13  she could pull some strings so that if and when I joined, she could arrange for

14  me to be posted close to her. [Id.]

15  After that, Claire wrote a "Project Prepare" for her brother to join the Sea Org.[3]

16  She asked me about my project prepare and plans for joining over the next

17  several years and continued to encourage me. She called me occasionally to

18  check on my progress . . . The gist of our conversations was that joining the

19  Sea Org would be a good, exciting and worthwhile thing to do. [SUF 49.]

20  Claire never told her siblings that she was held as a prisoner at RTC and

21  subjected to human trafficking and forced labor; to the contrary, as her mother states,

22  Claire always told her mother and siblings "that she was happy with her life in the Sea

23  Org and with her work in the Sea Org. She seemed happy, she told me that things

24  were going very well, and she manifested her dedication to that life by her efforts to

25

26  [3] A Project Prepare is a long term project to prepare a person to handle whatever is
necessary in his or her life to become qualified to join the Sea Org, and sometimes

27  may involve many actions and take several years. (SUF 49.) Claire discussed the
Project Prepare for her brother over the phone with her mother. (Id.)

28
- 10 -

1    recruit her brother and sister to join and work with her." (SUF 50.)

2          Claire Headley's efforts to recruit her siblings into the Sea Org reflected the fact

3    that she believed in the mission of the Sea Org. Indeed, while she now says that she

4    did not enjoy performing her various job functions as a Scientology minister, she

5    concedes that she did at the time, consistent with her sibling recruitment efforts:

6          Q. From the day you started to the day you left, you never enjoyed it?

7          A. I may have *thought that I did at the time*. I was raised to believe that that

8          was enjoyable.

9    (SUF 51, emphasis added.)

10          In fact, if at any time she did not enjoy it, Claire, like her husband, had

11   numerous, indeed almost daily, opportunities to leave if she wanted to do so. At all

12   times the Headleys lived in apartments or houses off the Base. (SUF 52.) When

13   Plaintiff first moved to Gold Base until March 1996, she lived at the Kirby

14   Apartments, which are located in the town of Hemet, about a 15 minute drive from

15   the Base. (SUF 53.) There were about 100 apartments at Kirby, occupied by both

16   Scientologists and non-Scientologists (including the manager), as well as a swimming

17   pool and lawn chairs, where, according to his book, Marc Headley got "a serious

18   tan." (SUF 59-61.) Plaintiff shopped at a market nearby, which had a pay phone, and

19   also went at times to the Hemet Mall on Sundays. (SUF 56-58, 63.)

20          Plaintiff went to live in Clearwater, Florida for approximately one year (from

21   March 1996 until January 1997) for one of her positions with RTC. (SUF 64.) While

22   Plaintiff was in Clearwater, Florida, she lived at the Hacienda Apartments, which

23   were about a 5-10 minute drive from where she worked, at a non-gated and unfenced

24   building in downtown Clearwater on a public street. (SUF 65-68.) She came and

25   went freely from the apartments, drove a staff vehicle and transported others, went to

26   the movies, restaurants, Busch Gardens amusement park, and jet-skiing, and flew

27   back and forth to Los Angeles on commercial jets. (SUF 69-74.)

28

- 11 -

1    Plaintiff returned to the Base to work for RTC in early 1997 and moved into

2  the Vista Garden Apartments in Hemet, at which both Scientologists and non-

3  Scientologists lived. (SUF 76-77.) Plaintiff sometimes drove herself to and from the

4  Base from Hemet. (SUF 78.) While she lived at Vista Garden, in 1999, plaintiff was

5  involved in a serious motorcycle accident. (SUF 79.) She was taken to Hemet

6  Hospital, about ten minutes from the Base, where she stayed for three days. (*Id.*) Her

7  doctors and nurses had no affiliation with RTC or CSI. (SUF 80-81.) After she was

8  released from the hospital, plaintiff participated in a lengthy program of physical

9  therapy, two to three times per week from August-December 1999 at a medical

10  facility in Hemet, requiring her to make numerous trips from the Base to Hemet.

11  (SUF 82.) The physical therapist was not a Scientologist. (SUF 83.)

12    Between 2000 and 2005, Plaintiff and her husband lived in various houses on

13  Sublette Road, which were not on the Gold Base property. Sublette Road is a public

14  road next to a public golf course and adjacent to the Gold Base. (SUF 84.)

15    During the periods they worked at the Base and lived in apartments in Hemet

16  or the houses on Sublette Road, the Headleys often left the Base to shop, go to

17  restaurants, take care of their dog or make and eat dinner. (SUF 85.) They had the

18  combination to the lock on the pedestrian gate at the International Base and opened

19  the gate themselves when they passed through it. (SUF 87.) They owned and drove

20  motorcycles and a jeep (for one year) and had access to and used automobiles. (SUF

21  35-38.) They attended church functions together (SUF 99-100), and often visited

22  family (including non-Scientologists) including a visit by Claire to South Carolina to

23  visit her non-Scientologist grandmother. (SUF 101-110.) They had bank accounts

24  and a pay pal account. (SUF 112.) They had cell phones and Marc had a laptop with

25  Internet accessibility. (*Id.*) Claire often drove from the International Base to Los

26  Angeles for meetings and to bring another staff member for surgery and medical

27  appointments (SUF 91-93), and went to Big Bear ski resort for recreation. (SUF 98.)

28

- 12 -

1    Claire Headley never attempted to invoke the Sea Org's routing out procedure

2    to revoke her Sea Org vows and leave her positions with CSI or RTC. (SUF 119.)

3    She never attempted to leave without routing out until the day she did so successfully.

4    (SUF 120.)  While she asserts that she had thoughts about leaving "on and off" at

5    various times (SUF 121), Claire testified that she did not because she did not want to

6    be separated from her husband or her family, as she would be if she were declared a

7    suppressive person for leaving the Sea Org without routing out; she did not know

8    where to go or what she would do; and that she had no one to go to who was outside

9    of Scientology. (SUF 122.)  Plaintiff also testified that she did not leave because she

10   had no money, no resources, no connections, and no means of transportation. (*Id.*)

11   Ultimately, however, plaintiff admitted that she only decided to leave near the end of

12   her tenure, testifying that "it took a fair bit to make me actually get to the point of

13   leaving because I was very firmly connected, and I knew absolutely nothing else." It

14   was not one event, but "many events over a course of several years" that led her to

15   depart. (SUF 16.)  She only decided to leave, at about the time she actually did, after

16   the occurrence of two key events that preceded and precipitated her departure: a

17   major dispute about her ministerial assignment and reassignment, and accusations

18   about ethical violations by her husband Marc, causing his precipitous departure

19   without telling Claire. As she later wrote to her mother (see *post*), it was the latter

20   event that was the proximate cause; if Marc had not left, "this [leaving] would not

21   have been my decision." (SUF 133.)

22   Defendants previously have described in detail in their previous Motion for

23   Partial Summary Judgment the various positions Headley held during her lengthy

24   tenure at Golden Era and RTC.  See Joint Brief at 13-16, and record references

25   therein.  Near the end of that tenure, Headley became embroiled in an ecclesiastical

26   dispute that resulted in her removal from her position at RTC in late 2004 and her

27   reassignment to a senior ecclesiastical position at CSI, a transfer she bitterly opposed

28                                              - 13 -

1   and resisted. (SUF 123.)  While the reason for that removal and transfer are

2   somewhat in dispute, according to Claire (whose account is accepted for purposes of

3   this motion) it came about because RTC issued a new policy that henceforth RTC

4   staff members either must be unmarried or, if married, only to another RTC staff

5   member.  If an existing RTC staff member were married to a staff member of another

6   Scientology organization, such as CSI or Golden Era, the RTC staff member would

7   be transferred out of RTC.  (Id.)  According to Claire, she was given a choice: either

8   to divorce her husband or accede to the transfer.[4]  (Id.)

9        That purported choice caused Claire to become "distraught."  She claims she

10  seriously considered divorcing Marc in order to retain her senior position at RTC

11  (despite the alleged fact that the position involved human trafficking).  She requested

12  RTC for permission to keep her position without divorcing Marc, and continued

13  "pleading for [her] position [with RTC]" until Marc left on January 5, 2005.  (SUF

14  125.)  Not only were her pleas unheeded, but she was told that she was not authorized

15  for her new position at CSI (SUF 126); in short, she was left in a position of not

16  knowing what her assignments or positions would be.  She concluded that "I saw that

17  there was absolutely nothing positive being accomplished by my remaining there."

18  (Id.)

19

20      [4] In reality, no such choice was imposed upon Ms. Headley; she, as well as a

21  number of other RTC staff, simply were removed from their positions at RTC for
    completely independent ecclesiastical reasons. (SUF 124.) Indeed, Ms. Headley

22  herself described the meeting at RTC at which she and others were dismissed from

23  RTC. (Id.) Nevertheless, for purposes of this motion, RTC accepts Claire's account,
    but notes that judicial resolution of a dispute concerning the nature of and reasons for

24  the change in her ministerial assignment would violate the ministerial exception.

25  Alcazar, 598 F.3d at 672, 674 (exception applies "to employment decisions regarding
    ... ministers" and "encompasses all tangible employment actions", including but not

26  limited to " . . . the duty [a minister] is to perform in the furtherance of the religious

27  mission of the church").

28

Marc's departure came about immediately thereafter as a result of Golden Era's discovery that he had been using his personal PayPal account to deposit money he received from selling surplus Golden Era equipment over Ebay, resulting in accusations that he had engaged in peculations. (SUF 127.) Prior to being informed of the allegations, on December 28, 2004, Marc and Claire had attended the Scientology New Year's event at the Shrine Auditorium. (SUF 128.) After the event, they posed for photos, left by themselves to see Claire's family in La Crescenta, and then drove back alone for several hours to their house on Sublette Road, just in time to catch a movie. (*Id.*) After the New Year, Marc's superior told him he was being investigated for possible embezzlement, but asked him first to fix a few points on his last written submission concerning AV systems. Marc writes, "[h]alf of me wanted to tell her to go fly a kite, but the other half of me had a plan [to leave]." (SUF 129.) That plan did not involve "routing out", nor did it involve telling Claire. Rather, on January 4, 2005, Marc left "for good," after walking home off the Base through the gate the night before. (*Id.*)

Claire spoke to Marc on the phone and tried to convince him to return. According to her, he had been upset because "He ha[d] constantly been fighting to get the [A/V] systems done with no finance and no personnel." He stated to Claire that "[h]e couldn't take being a shit-head any more." To this, Claire responded that "he was doing something of value and ... needed to come back and complete the project he was working on." Marc refused. (SUF 130.) He described their conversation in his book:

> "Well what about us?" Claire is crying now. "You have to come back." . . . "I don't know what I am gonna do. I want you to come back. I love you so much," Claire cries. "Well, I will never come back ... Ever. Never. Never Ever.... Bye." I hang up. [*Id.*]

- 15 -

1    In Claire's words, Marc's refusal caused her to be "emotionally distraught and

2    devastated." (SUF 131.) This, in addition to Claire's continuing "distraught" state

3    and disappointment over her removal from RTC, was what caused her to leave

4    shortly thereafter. As she explained, "[m]y husband had left. I knew that if I didn't

5    leave, I would never see him again." (SUF 132.) She explained her reasons for

6    leaving in a letter to her mother written soon *after* she left:

7        Obviously the change of org [the transfer from RTC to CSI] and so forth was

8        not easy, but I could live with it and was getting my feet on the ground. I lost

9        it when Marc left. I simply could not live with the idea of never seeing him

10        again . . . So I made the choices I made and will have to live through the

11        consequences of my action. . . . *This would not have been my decision had*

12        *circumstances been otherwise.* I have endured a lot over the years and I am not

13        one to easily give up – *it was simply that I did not feel it possible to turn my*

14        *back on Marc.*

15    (SUF 133.) (Emphasis added.)

16    When Ms. Headley left, Greg Wilhere, a senior Scientology official went to the

17    bus station in Las Vegas to try to convince her to return. No effort was made to seize

18    her or otherwise physically force her to do so. She refused to be persuaded, got on a

19    bus, and traveled to Kansas City to be reunited with her husband. No one ever tried

20    to force her to return. Afterward, she sent an e-mail to Wilhere stating, "I am really

21    sorry for what happened in Vegas, and what happened period – I know you were

22    trying to help me and I'm sorry I let you down." (SUF 136.)

23    Shortly after plaintiff and her husband left, plaintiff contacted defendants about

24    retrieving her personal belongings. Plaintiff's husband went to collect their personal

25    items, which consisted of 67 boxes, and included items such as a large amount of

26    clothing, make-up and other personal items, numerous DVDs (including movies such

27    as Braveheart, Daredevil, Titanic, and Gladiator), numerous books (including the

28

- 16 -

1   Lord of the Rings trilogy), several magazines (including GQ, Rolling Stone,

2   Premiere), several CDs, a large jewelry collection, a large amount of audio/video

3   items (including CD players, speakers, a television monitor, and a turntable), an

4   exercise bike, and their dog (for which the church had cared) (SUF 145), a unique

5   collection for victims of "human trafficking".

6          In May 2006, plaintiff filed a lawsuit against a third party in Kansas City for

7   false imprisonment for an incident in which she and her husband were "detained" by

8   a security guard at her apartment complex. (SUF 146.)  She wrote a letter to the

9   management of the apartment complex stating, "let me make clear that in 15 years of

10  apartment residence in California NEVER have my husband or I been subjected to

11  such physical abuse, harassment or treatment as we received at the hands of your

12  'Security'- where we were physically held, handcuffed and treated like common

13  criminals." (SUF 147, original emphasis.)  She testified in a deposition to the same

14  effect: "we've been residents of apartments in California for 15 years, and we never

15  had anything remotely like this occur."  (*Id.*)

16         **3.     Claire Headley's Two Abortions.**

17         When Ms. Headley was ten years old, her mother, who was a member of the

18  Sea Org, became pregnant. (SUF 170.)  This was the period when the Sea Org was

19  about to implement its new policy that Sea Org members could not remain in the

20  Order if they had children, and Claire's mother was told she would be one of the last

21  persons who would be permitted to remain in the Sea Org after having a baby.  (SUF

22  170-71.)  Nevertheless, her mother routed out soon thereafter. (SUF 171.)  Thus,

23  even as a teenager, Ms. Headley was aware of the policy that Sea Org members were

24  free to have children but would be required to leave the Sea Org if they exercised that

25  choice.  She also knew from her mother's example that a Sea Org member who had a

26  baby could route out and remain in good standing.

27

28
                                    - 17 -

1    The Headleys married in 1992.  She had an unplanned pregnancy in 1994.  No

2    one ordered her to have an abortion; one staff member, not someone senior to her,

3    merely inquired whether she intended to do so.  She testified, "I wanted a family.  But

4    I was in a position where I knew that I couldn't."  (SUF 172.)  And she also knew she

5    and her husband would be required to route out of the Sea Org within 60 days if she

6    chose to become a mother, which, as noted above, would require them to participate

7    in confessionals and to contribute by performing chores, such as gardening, cooking,

8    cleaning, etc.  According to Headley, this constituted forcing her to have an abortion

9    because she would be required to do "manual labor" and participate in

10   "interrogations."  (SUF 173.)  In her proposed Third Amended Complaint, she alleges

11   that she "would have been demoted, fired, or punished if she had the child.  As a

12   result, Plaintiff had an abortion to keep her position at CSI and not risk the adverse

13   consequences of having her baby."  (Docket #129-1, ¶10.)  In other words, had she

14   and her husband not decided to have an abortion, she would have been *required* to

15   leave the Sea Org and CSI within 60 days (SUF 172-73), and thus would have been

16   free from the "forced labor" and "human trafficking" she claims to have suffered.

17   Plaintiff had another unplanned pregnancy and voluntary abortion in 1996.

18   The circumstances were not materially different.  (SUF 175.)

**ARGUMENT**

**I.    SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING
PLAINTIFF'S TVPA CLAIM FOR "FORCED LABOR"**

22   The essence of a claim for "forced labor" under 18 U.S.C. § 1595 is that the

23   plaintiff is held in some form of captivity and forced to perform labor against his or

24   her will.  Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18

25   U.S.C. § 1589 (defining "forced labor").  Headley's own statements, testimony and

26   writings establish that she cannot make out such a claim.

- 18 -

1    First, as shown above, because she was raised as a devout Scientologist and

2    daughter of a Sea Org member, Headley believed in the mission of the Sea Org,

3    believed that she was doing the right thing in working for CSI and RTC, and, at the

4    time, "thought" that she enjoyed performing her various job functions as a

5    Scientology minister, so much so that she recruited her brother and sister not only to

6    join the Sea Org but to work side-by-side with her on the International Base.  See

7    *ante* at 9-11.  It begs credulity that plaintiff would make repeated efforts over a period

8    of years to recruit her siblings into a lifestyle from which plaintiff herself allegedly

9    wanted to "escape" and which she believed constituted human trafficking.  Indeed,

10   together with her husband, plaintiff is unique in claiming that work that she found

11   "enjoyable" "at the time" and to which she was religiously committed constituted

12   "forced labor".  The fact that she *now* believes that it was not enjoyable after all

13   cannot convert her prior ministerial activity into "human trafficking".

14   Second, as also forth in the Statement of Facts (*supra*) and the Separate

15   Statement, Headley lived off the Base's premises in public apartments several miles

16   away or in houses on public roads; often left the Base to shop, go to restaurants, take

17   care of her dog or make and eat dinner; had the combination to the lock on the

18   pedestrian gate at the Base and opened the gate herself when she passed through it;

19   owned (with her husband) and drove motorcycles and a jeep and had access to and

20   used automobiles; traveled to and around Los Angeles and California in carrying out

21   her post positions; visited friends and family in the Los Angeles area; attended public

22   church functions with her husband; had bank accounts; had a cell phone and access to

23   her husband's cell phone and laptop with Internet access; and visited and maintained a

24   relationship with her grandmother, who was not a Scientologist and lived in South

25   Carolina.

26

27

28

- 19 -

1   Headley's forced labor claim thus cannot be founded upon physical restraint

2   prohibiting her from leaving,[5] but rather upon her choice not to route out; her belief

3   that if she left unilaterally without participating in the "routing out" process, she

4   would have nowhere to go and nothing to do with her life; would be subject to a

5   church "declare" and would not be able to communicate with her husband and other

6   Scientologist friends or family; and that she was subject to what she considered to be

7   arbitrary and harsh church discipline.  As shown below, each of these grounds must

8   be rejected as a matter of law.

9   **A.    The Ministerial Exception Precludes Application of the TVPA to the "Employment" Relationship Between a Church and its Ministers, and In Particular Between Headley and CSI and RTC**

10

11   Headley has brought a civil claim under 18 U.S.C. § 1595, a civil labor statute.

12   Section 1595 provides that "an individual who is a victim of a violation" of the forced

13   labor statutes "may bring a civil action" against someone who has "obtain[ed] the

14   labor or services of [that] person by any one of, or by any combination of,"

15   designated means set forth in the section.  18 U.S.C. § 1589.  Thus, to determine

16   whether Headley can maintain her claim, the Court must inquire into the means by

17   which CSI and RTC acquired and kept Headley's services, one of its ministers.  That,

18   however, is precisely what the Court *cannot* do under the ministerial exception and

19   the First Amendment.  *See, e.g., Alcazar,* 598 F.3d at 671-72 ("The Religion Clauses .

20   . . require a 'ministerial exception' to employment statutes if the statute's application

21   would interfere with a religious institution's employment decisions concerning its

22   ministers.")  "Because the ministerial exception is constitutionally compelled, it

23   applies as a matter of law *across* statutes, both state and federal, that would interfere

24

25   _____

   [5] In dramatic contrast, when she was restrained by a security guard at her

26   apartment in Kansas City in 2005, she wrote that "NEVER have my husband or I

27   been subjected to such physical abuse, harassment, or treatment . . . where we were

   physically restrained handcuffed and treated like common criminals."  (SUF 147.)

28
   - 20 -

1   with the church-minister relationship." 598 F.3d at 673 (emphasis added). Thus,

2   while government certainly may criminalize or create civil remedies for kidnapping,

3   aggravated battery, or false imprisonment even by churches of their ministers, it may

4   not do so by means of a broad statute whose primary purpose and focus is to regulate

5   labor, that reaches conduct not constituting forcible restraint or violence, and by

6   applying it to the labor relationship between a church and its ministers. "The

7   exception was created because government interference with the church-minister

8   relationship *inherently* burdens religion." *Id.* (court's emphasis).

9       The statutory remedies for a § 1595 violation demonstrate why the statute must

10  be construed as subject to and limited by the ministerial exception. 18 U.S.C. § 1593

11  states that a person who proves a § 1595 claim will be entitled to restitution and "the

12  greater of the gross income or value to the defendant of the victim's services or labor

13  or the value of the victim's labor as guaranteed under the minimum wage and

14  overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. § 1593(b)(3). The

15  ministerial exception makes Defendants immune from exactly this kind of judicial

16  interference with ministerial relations, however. The courts cannot dictate to

17  churches what they should pay their ministers, under § 1593, the FLSA, or otherwise.

18  Headley is simply trying to impose an unconstitutional wage regulation on CSI

19  through the "back door" of the TVPA.

20      To interpret the TVPA constitutionally, it must be construed not to apply when the

21  "labor or services" in question are comprised of ministerial activities for a church.[6]

---

22  [6] Courts should not interpret a statute in a manner that raises serious

23  constitutional questions unless such an interpretation is compelled by an "affirmative

    intention of the Congress clearly expressed." *NLRB v. Catholic Bishop of Chicago*,

24  440 U.S. 490, 506 (1979) (interpreting labor statute so as to avoid conflict with Free

25  Exercise and Establishment clauses). Here, in the absence of any indication that

    Congress intended to criminalize and sanction common and long-established

26  religious practices by passing the TVPA, the Court should follow this basic rule of

27  construction and hold the statute inapplicable.

28

- 21 -

1    Otherwise, courts will be in the untenable, and unconstitutional, position of constantly

2    questioning the means by which religious institutions acquire and keep their ministers'

3    services. Religious practices which, as we show *infra* are protected from state

4    interference — such as requiring that monks, priests, or other ministers live in seclusion,

5    take vows of poverty, engage in humble labor, not interact with those of other

6    persuasions, give up worldly possessions such as televisions and computers, and refrain

7    from sex — would become the subject of judicial inquiry to determine if they were

8    improper "means" of acquiring "labor or services," 18 U.S.C. § 1589, directly contrary

9    to the law of this circuit (and every other circuit). Such judicial interference would

10   require both substantive and procedural entanglement in churches' affairs, contrary to

11   the Establishment Clause. *See, e.g.*, *Alcazar*, 598 F.3d at 672-73.

12          Indeed, that very danger is demonstrated by this case. As we have shown, by

13   her own words and actions, Headley's reasons for leaving RTC at the time she did

14   were closely related and entwined with ongoing disputes between RTC and her

15   concerning her ministerial assignment, her performance of her ministerial duties and

16   her ethical behavior, as well as that of her husband, whose departure was the

17   proximate cause of her own. If the Court were to attempt to apply TVPA to the

18   process by which Headley's relationship to RTC was terminated, it inevitably would

19   become entangled in matters of religious practice, in violation of the ministerial

20   exception. *Higgins v. Maher*, 210 Cal. App. 3d 1168, 1170 (1989) (discussed more

21   fully *post* at 26-27).

22          Moreover, plaintiff has sought to compel document discovery and proposes to

23   inquire at the depositions of defendants concerning such matters as the "average

24   hours per week" Sea Org members have worked for defendants for a 16 year period;

25   defendants' "personnel policies, rules, guidelines and procedures" including

26   "supervision procedures" and "the enforcement of personnel policies"; the

27   "implementation of personnel policies" with respect to Marc and Claire Headley;

28

- 22 -

1   "routing out procedures"; and defendants' "supervision hierarchy."  Lest there be any

2   doubt, plaintiff repeatedly, without acknowledging *Alcazar*, states in her proposed

3   joint stipulations with respect to her motions to compel discovery that each of her

4   discovery requests are "directly relevant to Plaintiff's claim of Forced Labor."[7]  (*See*

5   *e.g.,* Hill, Decl., Ex. 138.)  That is precisely the point, and demonstrates why TVPA

6   cannot be applied here.

7        At a minimum, TVPA cannot be applied to a church's relationship with its

8   ministers in the absence of actual physical force or restraint or the threat of the

9   imminent and likely use of such force, such as that the Headleys later experienced in

10   a different context in their apartment complex in Kansas City.  A compelling analogy

11   is to the realm of political speech, also protected by the First Amendment.  The

12   Supreme Court has recognized that speech (like religious doctrine and practice) can

13   and often is intended to have a psychologically coercive effect.  *NAACP v. Claiborne*

14   *Hardware Co.,* 458 U.S. 886, 911 (1982) ("'The claim that the expressions were

15   intended to exercise a coercive impact on respondent does not remove them from the

16   reach of the First Amendment'") (quoting *Org. for a Better Austin v. Keefe,* 402 U.S.

17   415, 419 (1971)).  *See Gitlow v. New York*, 268 U.S. 652, 673 (1925) ("Every idea is

18   an incitement") (Holmes, J., dissenting).  Nevertheless, such speech, even "advocacy

19   of the use of force or of law violation," is protected except and only to the extent that

20   it "'is directed to inciting or producing imminent lawless action and is likely to incite

21

22        [7] To defendants' objections that inquiry into such matters and judicial

23   determination based upon them would violate both the procedural and substantive

    components of the ministerial exception, plaintiff, again ignoring the *Alcazar*

24   decision and this Court's April 2 Order, incredibly states, "The objections based on

25   the First Amendment and the California Constitution are unfounded.  There is no case

    law or constitutional provision in the First Amendment or the California Constitution

26   that indicates that certain information is protected from discovery due to the First

27   Amendment or California Constitution."

28

- 23 -

1  or produce such action.'" *Claiborne Hardware,* 458 U.S. at 927-28 (quoting

2  *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1968)).  So, too, a church's application of

3  religious doctrine and practice to its ministers must be protected in the absence of

4  actual physical restraint or the threat of imminent restraint.  Defendants' actions with

5  respect to Headley cannot meet that constitutionally mandated standard.

6      **B.    Even if TVPA Could Be Applied to Narrow Circumstances of Actual
7          or Threatened Physical Restraint, Headley's Fear That She Would
        Be Subject to Excommunication If She Left Golden Era or RTC
        Cannot Be the Basis of a Forced Labor Claim**

8

9      A church's implementation of a policy requiring its members to "shun" an

10  excised former member or excommunicating that member from the religious

11  community may not be a basis to impose civil liability upon the church or its

12  officials. *Paul v. Watchtower Bible & Tract Soc'y of New York, Inc.,* 819 F. 2d 875

13  (9th Cir. 1987).  In *Paul,* the court rejected emotional distress claims resulting from

14  the Jehovah's Witnesses' shunning of a former parishioner, because the First

15  Amendment "permits them to engage in the practice of shunning pursuant to their

16  religious beliefs without incurring tort liability," *id.* at 879, even if the practice in fact

17  caused emotional distress.  Indeed, the court went further and held that claims for

18  emotional distress arising out of participation in a church are not actionable:

19      Intangible or emotional harms cannot ordinarily serve as a basis for

20      maintaining a tort cause of action against a church for its practices — or

21      against its members....Offense to someone' sensibilities resulting from

22      religious conduct is simply not actionable in tort....Without society's tolerance

23      of offenses to sensibility, the protection of religious differences mandated by

24      the first amendment would be meaningless.

25  *Id.* at 883 (citations omitted).  *Accord, Van Schaick v. Church of Scientology, Inc.,*

26  535 F. Supp. 1125, 1139 (D. Mass. 1982); *Orlando v. Alamo,* 646 F.2d 1288, 1290

27  (8th Cir. 1981).

28

        - 24 -

JMBM | Jeffer Mangels
Butler & Marmaro LLP

1    Fear of being declared a "suppressive person" thus cannot constitute an

2    actionable basis for a forced labor claim.  To be declared a suppressive person is in

3    effect to be excommunicated from the Scientology religion.  It is inconceivable that a

4    Catholic Bishop could succeed in an emotional distress claim against his Church,

5    claiming that he remained a Bishop or engaged in Catholic religious practices only

6    out of fear of being excommunicated.  Such a claim should be no more conceivable

7    against a newer, minority religion.

8    **C.    Even if TVPA Could Be Applied to Narrow Circumstances of Actual
     or Threatened Imminent Physical Restraint, Defendants' Imposition
9    or Threatened Imposition of a Restricted Lifestyle and of Church
     Discipline Upon a Sea Org Member Cannot Be the Basis of a Forced
10   Labor Claim**

11   Headley's claim that she was coerced to remain at Golden Era and RTC

12   because of fear that she would be "declared" and thereby separated from her husband

13   is but a more specific example of her claim that she did not leave because of the

14   restricted lifestyle of Sea Org members, including imposition or threatened

15   imposition of discipline by CSI and RTC.  Headley asserts, *inter alia,* that her access

16   to the outside world was restricted (despite the facts that she had motorcycles, access

17   to transportation, a cell phone, access to the Internet, and frequent travels around

18   California and Los Angeles); that the Base was subject to strict security with limits

19   upon access and the ability to leave (despite the facts that she had the combination to

20   the pedestrian gate, came and left on her own, and lived in apartments and houses off

21   the Base); that she performed lowly tasks and physical labor (despite the fact that her

22   principal duties involved acting as a senior executive and ecclesiastical official of

23   RTC who performed "police" functions); that she was subjected to a highly structured

24   work environment, humiliating treatment, and had insufficient sleep; that she

25   underwent confessions of transgressions for which she was subject to disciplinary

26   action; that she was removed from her ministerial position at RTC for arbitrary and

27   improper reasons (including, according to her, that she did not divorce Marc); and

28

- 25 -

1   that if she left, she would have no close friends or family, nowhere to go and nothing

2   to do with her life.  All this, Headley apparently claims, imposed psychological and

3   emotional barriers that prevented her from leaving her allegedly forced labor.

4        These latter claims also must be rejected as a basis for liability under the forced

5   labor statute.  While TVPA's provision that labor can be "forced" by the use of

6   certain forms of psychological or emotion coercion as well as by physical force is

7   perfectly rational and constitutional in a secular context, such an application of the

8   statute in a religious context to the "lifestyle constraints that come with being a

9   member of [a religious order such as] the Sea Org" (*Claire Headley* Order at 4-5) and

10  the religious discipline of ministers, cannot be made under the First Amendment and

11  the ministerial exception.[8]  Indeed, such matters relate to Headley's labor with

12  Defendants, and constitute precisely the kind of "tangible employment actions"

13  covered by the ministerial exception.

14       The appropriateness of a hierarchical church's disciplinary actions taken

15  against a member, especially a minister, has consistently been held to be beyond the

16  cognizance of the civil courts.  Indeed, the courts have been particularly deferential

17  when questions of church discipline are at issue.  *See, e.g., Serbian Eastern Orthodox*

18  *Diocese v. Milivojevich*, 426 U.S. 696, 717 (1976) ("questions of church discipline

19  and the composition of the church hierarchy are at the core of ecclesiastical

20  concern").  Even if an ecclesiastical decision appears harsh, humiliating, unfair, or

21

22       [8] The Court merely need compare the "harms" alleged by Headley from
    participation in the life of a Sea Org member to the harms proven in the criminal
23  prosecutions brought under the TVPA.  *See, e.g., United States v. Sabhnani*, 599 F.3d
    215 (2d Cir. 2010) (violent threats against trafficked immigrants); *United States v.*
24  *Calimlim*, 538 F.3d 706 (7th Cir. 2008) (Wood, J.) (same); *United States v. Kaufman*,
    546 F.3d 1242 (10th Cir. 2008) (threats and physical force used to coerce mentally ill
25  residents to perform manual labor in the nude); *United States v. Marcus*, 487 F. Supp.
26  2d 289 (E.D.N.Y. 2007) (BDSM and sexual abuse), *vacated on other grounds*, 538
27  F.3d 97 (2d Cir. 2008).

28
                                    - 26 -

irrational from a secular viewpoint, civil courts have no role to play: "Constitutional
concepts of due process, involving secular notions of 'fundamental fairness' or
impermissible objectives, are therefore hardly relevant to such matters of
ecclesiastical cognizance." *Id.* at 715 (footnote omitted). "[S]ecular courts will not
attempt to right wrongs related to the ... discipline or administration of clergy."
*Higgins v. Maher*, 210 Cal. App. 3d at 1175.

In *Paul,* 819 F.2d at 883, the Ninth Circuit reaffirmed these principles of
judicial deference even to harsh ecclesiastical disciplinary decisions that inflict severe
humiliation and emotional distress on members, let alone ministers, recognizing that
acts short of physical force that would be subject to tort liability in a secular context
are protected when undertaken in an ecclesiastical context:

> Churches are afforded great latitude when they impose discipline on members
> or (former members) of a church.  We agree with Justice Jackson's view that
> "[r]eligious activities which concern only members of the faith are and ought to
> be free — as nearly absolutely free as anything can be." *Prince v.
> Massachusetts*, 321 U.S. 158, 177 (1944) (concurring).

*Higgins v. Maher, supra,* dramatically demonstrates the limitations the First
Amendment and the ministerial exception placed upon application of civil tort law to
employment decisions and discipline imposed in an ecclesiastical context.  In
*Higgins*, a Catholic priest brought numerous tort claims against his Bishop and the
Church for his removal from his position, subsequent mandated psychiatric treatment,
which included drugs and shock therapy,[9] and public revelation of alleged private

---

[9] Higgins averred that "upon persuasion from the Church," he "underwent a
program of rehabilitation with a therapy-oriented organization within the church,"
was "given various drugs which caused him to become nervous and lose much of his
reasoning ability" and was "treated with electroshock therapy." 210 Cal. App. 3d at
1172.

- 27 -

JMBM | Jeffer Mangels
Butler & Marmaro LLP

1   defamatory information.  The court found that the complaint adequately alleged "torts

2   of invasion of privacy, defamation, and the intentional and negligent infliction of

3   emotional distress," and therefore would be actionable in a secular context.  210 Cal.

4   App. 3d at 1175.  The court, however, dismissed the complaint because, even if

5   defendants had engaged in the alleged tortious conduct, "the acts so taken were part

6   and parcel of the Bishop's administration of his ecclesiastical functions," and thus

7   were protected activity under the ministerial exception.  *Id.* at 1175-76.  Further:

8           the torts recited are simply too close to the peculiarly religious aspects of the

9           transaction to be segregated and treated separately — as simple civil wrongs.

10          The making of accusations of misconduct; the discussion of same within the

11          order; the recommendation of psychological or medical treatment; the

12          infliction, whether *intentionally* or negligently, of emotional distress — these

13          are all activities and results which will often, if not usually, attend the difficult

14          process by which priestly faculties are terminated.

15   *Id.* at 1176 (emphasis added).  *Accord, Gunn v. Mariners Church,* 167 Cal. App. 4th

16   206, 217 (2008) (following *Higgins* and holding that "the ministerial exception

17   applies to preclude further judicial review *regardless of the otherwise tortious nature*

18   *of the statements*") (emphasis added).

19          Here, it is equally impossible to separate out any claim that Headley was

20   subjected to forced labor by psychological or emotional distress from Headley's

21   commitment to the Sea Org and "the difficult process by which" Headley relinquished

22   her important position within the Church.  The allegations of forced labor here are

23   simply an effort to obtain civil adjudication of Headley's decision to adhere to Church

24   discipline at a time when remaining within the Church was of paramount importance to

25   her, at the least because she wanted to remain with her husband.  The Headleys, it must

26   be emphasized, were not mere parishioners.  They were, as members of the Sea

27   Organization, ministers within the ecclesiastical leadership of Scientology, who had

28
                                        - 28 -

1    vowed to dedicate their lives to help advance Scientology's goals. Now that Headley's

2    priorities have changed, she asks this Court and a jury to review the propriety of the Sea

3    Org's lifestyle and the Church's imposition of discipline and her obedience to it. As

4    made clear in *Serbian Orthodox Diocese*, *Paul*, and *Higgins,* however, this is an inquiry

5    that secular courts cannot undertake. *See also Meroni v. Holy Spirit Ass'n*, 506 N.Y.S.2d

6    174, 176-77 (N.Y. App. Div. 1986) (church's alleged "brainwashing" by imposition of

7    "highly programmed behavioral control techniques in a controlled environment"

8    "constitutes common and accepted religious proselytizing practices, *e.g.*, fasting,

9    chanting, physical exercises, cloistered living, confessions, lectures, and a highly

10   structured work and study schedule, . . . *i.e.*, as a method of religious indoctrination that

11   is neither extreme nor outrageous.")

12        Thus, Headley's claim that Sea Org members on the Base are isolated from

13   other friends, family and the outside world cannot be the basis of a forced labor

14   claim. Many religious organizations encourage or even require that adherents,

15   particularly those who join religious orders or achieve high ecclesiastical authority,

16   abandon secular ties and depend on their Church for all social and emotional contact,

17   maintaining themselves as insular communities open only to co-religionists. (*See*

18   Flinn Decl., ¶ 33.) Such requirements often go far beyond any restrictions

19   experienced by the Headleys, who lived together off the Base, had access to

20   transportation and telecommunications, visited, spoke and corresponded with their

21   families and frequently traveled around the United States. Courts have frequently

22   held, as a matter of law, that religious practices of encouraging isolation from the

23   secular world, or other similar religious beliefs and practices, are not tortious.[10] *Van*

24   _____

25        [10] As can be seen from cases such as *Meroni*, Headley's complaint that she or
     her husband engaged in humbling physical labor is a common practice among

26   religious orders. Members of Christian religious orders are required to take vows of
     obedience and humility, which frequently entail performing lowly tasks that might

27   appear degrading and demeaning to outsiders. (Flinn Decl., ¶¶ 23, 26, 53.) Zen

28                                                                    (footnote continued . . .)

                                            - 29 -

1   *Schaick*, 535 F. Supp. at 1139; *Paul*, 819 F.2d at 883; *Orlando v. Alamo,* 646 F.2d

2   1288, 646 F.2d 1290 (8th Cir. 1981).

3        For these reasons, Headley's complaint that she did not leave CSI or RTC

4   because she had few or even no family, friends or associates outside of the religion,

5   no secular experiences or training, and nowhere else to go or nothing else to do with

6   her life cannot be a basis for a claim under TVPA or any other tort theory.  For better

7   or worse, Headley was raised as a committed Scientologist and committed her life to

8   the Sea Org; indeed, as she acknowledges, she was fully familiar with the Sea Org

9   life because her mother had been a Sea Org member.  In this respect, Headley is no

10  different than young people throughout history who, raised in a devout religious

11  tradition, commit themselves to a lifetime of religious service as monks, nuns, priests,

12  etc, often in isolated abbeys, convents, and monasteries, and pursuant to vows of

13  poverty, abstinence, abnegation, isolation, and/or even silence.  All such individuals

14  are subject to the possibility that their commitment will not remain steady and firm,

15  and that they may become disillusioned or disappointed by their church.  If they

16  change their minds, they risk being cast into a secular world with which they are

17  unfamiliar, for which they are untrained, and in which, perhaps, they may be alone.

18  Certainly a Buddhist monk or a Catholic nun who spends 20 or 30 years in a

19  monastery or convent would be in no better position to transform to a secular life if

20  he/she were to lose his/her commitment than was Claire Headley.

21       Such individuals, under our system of religious freedom, have a right to make

22  such a choice and to assume such a risk, and all churches have a right to accept and

23  rely upon such a commitment.  Thus, it would seem beyond cavil that the state could

---

Buddhists may be required to perform repetitive and apparently meaningless tasks as
a means toward enlightenment. (*Id.*)  Likewise, Headley's claim of insufficient sleep
hardly constitutes an unusual practice among religious orders. Franciscan friars,
Cistercians and Trappists all engage in practices that Headley would undoubtedly
characterize as "sleep deprivation."  (*Id.*, ¶ 54.)

- 30 -

not enact a statute prohibiting a person from seeking to join a religious order in which he/she agrees to the life style constraints inherent in such a choice, or prohibiting a church from recruiting or accepting such people from joining the order and relying upon their vows of commitment, on the basis that the state is protecting the individual from making a life choice that could severely limit his/her lifestyle or secular social or economic potential in the future if he/she later were to walk away from such religious commitment.  Equally inconceivable is that the state constitutionally could enact a statute requiring a church to provide warnings or caveats to such prospective religious initiates that they may be limiting their subsequent life choices if they agree to join in such a religious life but later decide that it was a mistake to join the order.  Nor, under the ministerial exception, could the state enact legislation requiring a church after the fact to compensate a nun, monk, priest, or member of a religious order who chooses to abandon his/her religious calling after years of religious service, on the basis that upon such renunciation of faith, he or she had nowhere else to go, nothing to do, no secular friends, contacts or training, etc.  *See Alcazar, supra.*

Accordingly, Headley, as with all other Sea Org members, had a First Amendment right to commit her life to the Sea Org, and CSI and RTC had a First Amendment right to accept her commitment.  If a court were to find that a person such as Headley who makes such a commitment and then becomes disaffected and disillusioned thereafter may bring a civil lawsuit *after the fact* because her secular life choices have been substantially narrowed or compromised, then the court in effect would be denying the right of such a person to have made such a religious commitment in the first place, and of a church to seek and accept it, just as surely as if the legislature had directly prohibited or regulated it.  Churches would be severely chilled and restrained from encouraging or accepting people into such a religious life and religious order, and individuals seeking such a life, including the vast majority of those who would remain committed to their original choices, ultimately would be

- 31 -

1   denied the ability to pursue it.  As aptly stated by the New York Appellate Division in

2   *Meroni, supra*, 506 N.Y.S.2d at 178 (citations and inner quotations omitted):

3   > [An individual] must have the personal and individual right to determine for

4   > himself or herself to associate with a religious group...  Otherwise, in order to

5   > avoid potential liability, neither the Church nor any other association could

6   > ever rely on a person's agreement to join, and the individual's ability to

7   > consent to join would be severely compromised.

8   The clear lesson of the various cases discussed above is that the First

9   Amendment not only prohibits the state from interfering with such a religious

10  commitment directly, but also from creating liability or punishment for it after the

11  fact if the religious life does not work out to the satisfaction of the person who made

12  the commitment.  As with all freedoms, the freedom provided by the First

13  Amendment does not come without its risks and potential downsides even to those it

14  protects.  Our society has made a fundamental constitutional choice on the side of

15  such freedom.  It has decided that it is more important to protect the freedom of

16  choice of its citizens, and to require them to learn to anticipate and live with their

17  exercise of such freedom.  In short, when it comes to religious exercise and

18  association, the state must step aside and respect those choices and decisions.

19  **D.    The Religious Freedom Restoration Act Bars Plaintiff's TVPA Claim**

20

21  The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C.

22  §§ 2000bb et seq., reinforces the arguments made above that this Court cannot

23  impose forced labor sanctions on Defendant based on its religious practices.  RFRA

24  provides that "Government shall not substantially burden a person's exercise of

25  religion even if the burden results from a rule of general applicability" except "in

26  furtherance of a compelling governmental interest," and then only by "the least

27  restrictive means of furthering that compelling governmental interest."  42 U.S.C.

28

- 32 -

1    § 2000bb-1(b).  *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227

2    F.3d 1110, 1120 (9th Cir. 2000).

3         RFRA precludes state action coercing religious adherents "to act contrary to

4    their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v.*

5    *U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008).  RFRA amends *all* federal

6    law, whether enacted before or after RFRA itself, *see* 42 U.S.C. § 2000bb-3(a), (b),

7    unless a statute specifically excludes its application, which the TVPA notably does

8    not do.  A person whose religious practices are burdened in violation of RFRA "may

9    assert that violation as a claim or defense in a judicial proceeding[.]"  *Gonzales v. O*

10   *Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42

11   U.S.C. § 2000bb-1(c)); *see, e.g., EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 470

12   (D.C. Cir. 1996) (RFRA provided defense to Title VII action brought by plaintiff

13   whose position was the functional equivalent of a minister).

14        Application of TVPA to CSI's and RTC's imposition of ecclesiastical rules

15   and discipline with respect to its ministers and the Sea Org would unquestionably burden

16   free exercise.  Given that Headley was not physically restrained or imprisoned and

17   had numerous and ongoing opportunities to leave, no such showing can be made of a

18   compelling state interest to impose such a burden.

19   **E.     The Court Should Summarily Adjudicate That Headley's Partici-**
20   **pation In The Lifestyle Of The Sea Org And CSI's and RTC's**
     **Implementation Of Ecclesiastical Discipline Cannot Support A**
21   **TVPA Claim Against A Church Involving Its Ministers**

22        The Court also, or alternatively, should summarily adjudicate that the acts of

23   CSI and RTC with respect to the lifestyle restrictions of the Sea Org or defendants'

24   ecclesiastical rules, governance or discipline of its ministers, including Headley,

25   cannot be applied to support a TVPA claim against a church with respect to its

26   ministers.  In particular, plaintiff's claims that the defendant churches imposed

27   psychological and emotional barriers that prevented her from leaving her allegedly

28
                                         - 33 -

forced labor, by, *inter alia,* requiring her to perform lowly tasks and physical labor;
subjecting her to a highly structured work environment; subjecting her to humiliating
treatment; depriving her of sufficient sleep; requiring she undergo confessions of
transgressions for which she was subject to disciplinary action; mandating a formal
procedure, called "routing out" for Sea Org members who wish to revoke their vows
of service and leave the Sea Org; imposing disciplinary penalties, including the
equivalent of excommunication, upon Sea Org members who unilaterally leave their
positions without participating in the routing out process, all "encompass[] *tangible*
*employment actions*", including but not limited to "the determination of a minister's
salary, his place of assignment, and the duty he is to perform in the furtherance of the
religious mission of the church", *Alcazar,* 598 F.3d at 674, and may not be the basis
of a TVPA, or any other claim, against Defendants.  Only acts by which a minister is
subjected to physical force and restraint, or the threat of imminent and likely use of
such restraint, can be the subject of state interference, through a forced labor statute
or otherwise.

   As amended in December 2008, Rule 56 permits "[a] party against whom relief
is sought [to] move . . . for summary judgment on all *or part* of the claim."  Fed. R.
Civ. P. 56(b) (emphasis added).  The amendment codified the rule long applied in this
Circuit.  *See Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) (Rule
56 permits "a determination before the trial that certain issues shall be deemed
established in advance of the trial").  For example, in *DiSandro v. Makahuena*
*Corp.*, 588 F. Supp. 889, 891 (D. Haw. 1984), the court rejected an argument "that
summary judgment is available only where it will dispose entirely of at least one of
plaintiffs' claims."  The court held that "[s]ummary judgment is available to decide
purely legal issues....[Thus, i]t is appropriate to decide a few limited issues by
summary judgment, *even if those issues are not entirely dispositive of any one claim*.
Summary judgment can thus serve to set the issues for trial."  *Id.* at 892 (emphasis

- 34 -

1   added). *Accord First Nat'l Ins. Co. v. FDIC*, 977 F. Supp. 1051, 1055 (S.D. Cal.

2   1997) ("[e]ven if [the moving party] will not prevail on one of its causes of action,

3   the Court may still grant summary adjudication as to specific issues if it will narrow

4   the issues for trial"); *Bushnell v. VisCorp.*, 1996 WL 506914, at *11 (N.D. Cal. Aug.

5   29, 1996) ("a proper interpretation of Rule 56(b) allows summary adjudication on

6   individual parts of claims brought against a party").

7        It is important that the Court exercise its summary adjudication power in this

8   case because of the application of the ministerial exception to the relationship

9   between defendants and Claire Headley.  A central rationale for the ministerial

10   exception is the non-entanglement principle of the Establishment Clause.  By

11   granting summary adjudication on the issues in question, the Court will minimize

12   intrusion into "matters of discipline, faith, internal organization, or ecclesiastical rule,

13   custom or law," *Serbian Eastern Orthodox Diocese,* 426 U.S. at 713, which lie at the

14   heart of the exception. *Alcazar*, 598 F.3d at 673 (non-entanglement principle

15   "recognize[s] that the First Amendment strongly circumscribes legislative and

16   judicial intrusion into the internal affairs of a religious organization").

17        In addition, the Court will insure, as it must, that no trial or judgment will be based

18   upon protected activity.  In *NAACP v. Claiborne Hardware, supra,* the Court reversed a

19   judgment for civil conspiracy and an illegal boycott that involved elements of protected

20   (albeit "coercive") speech and alleged threats of violence precisely because the trial court

21   had not limited liability strictly to acts of violence and threats of "imminent" violence and

22   had not excluded from consideration those parts of the boycott activity that were protected

23   under the First Amendment. 458 U.S. at 920-23.  The Court warned:

24        When such conduct [violence or threats of imminent violence] occurs in the

25        context of constitutionally protected activity, however, 'precision of regulation'

26        is demanded.  Specifically, the presence of activity protected by the First

27        Amendment imposes restraints on the grounds that may give rise to damages

28

- 35 -

JMBM | Jeffer Mangels
Butler & Marmaro LLP

1  liability and on the persons who may be held accountable for those damages.

2  *Id.* at 916-17 (inner citations and quotations omitted).

3  **II.   PLAINTIFF LACKS STANDING UNDER THE CAL. BUS. & PROF. CODE AND UNDER ARTICLE III OF THE CONSTITUTION TO SEEK INJUNCTIVE RELIEF AGAINST DEFENDANTS' ALLEGED POLICY CONCERNING ABORTIONS BECAUSE SHE DID NOT SUFFER LOSS OF PROPERTY OR MONEY AND BECAUSE SHE CANNOT SHOW A DEFINITIVE LIKELIHOOD OF FUTURE HARM TO HERSELF FROM THE ALLEGED CONDUCT**

4

5

6

7  In her Second Cause of Action under California Business & Professions Code

8  §§ 17200, et seq., for "Injunctive Relief Re Unfair Business Practice," plaintiff "seeks

9  to enjoin certain illegal activity, to-wit coercing pregnant females to abort the child."

10  [¶46]. Plaintiff alleges that she was "ordered" to have two abortions "to remain an

11  employee in good standing with Defendants and to avoid adverse consequences in her

12  future employment." [¶48]. Plaintiff claims that this purported conduct violated

13  "state and federal law" as well as plaintiff's "inalienable constitutional rights,

14  including the rights of privacy." [¶49]. Plaintiff, of course, does not and cannot

15  allege that she lost money or property as a result of the purported conduct, or that she

16  personally is threatened by a recurrence of the conduct. Nevertheless, as relief she

17  seeks "an order banning this practice in the future" [¶49].

18  As we have shown above, defendants have no policy or practice at all with

19  respect to abortions. More precisely, to the extent defendants have any policy on the

20  subject, it is pro-choice. If a Sea Org member becomes pregnant, it is her choice

21  whether or not to have an abortion. If she chooses to have a child, she and her

22  husband are required to route out of the Sea Org. They will remain Scientologists in

23  good standing. No discipline or sanctions will be applied against them for making

24  that choice. Plaintiff's attempt to characterize the process of routing out as

25  punishment for having a child is merely her after the fact assertion; the routing out

26  process is required of all Sea Org members who leave in good standing, and has

27  nothing to do with abortions. It is protected by the First Amendment and the

28

- 36 -

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    ministerial exception, for all the reasons discussed above.

2         Defendants also have shown that no official or agent of either defendant forced

3    plaintiff to have her two abortions. She chose to have the abortions because, as she

4    acknowledged and indeed alleges, she did not wish to lose her position in the Sea Org

5    and her posts with Golden Era and RTC, the very posts she elsewhere contradictorily

6    claims constituted "forced labor."

7         The court need not reach these issues, however. Claire Headley left the Sea

8    Org and any relationship with defendants over five years ago. She no longer

9    considers herself a Scientologist, and in no possible way would she consider

10   returning to work for defendants. Whatever policy or practice defendants may have

11   with respect to the pregnancy and abortions of Sea Org members can have no effect

12   on her. In short, plaintiff utterly lacks standing to seek injunctive relief under the

13   California UCL, for two related reasons.[11]

14        First, plaintiff lacks standing to invoke California's Unfair Competition Law

15   because she does not and cannot allege that she lost money or property as a result of

16   the alleged conduct. In 2004, the voters approved Proposition 64, which amended the

17   UCL to provide that a private person has standing to bring a UCL action only if he or

18   she "has suffered injury in fact and has lost money or property as a result of the unfair

19   competition." Bus. & Prof. Code § 17204; *Troyk v. Farmers Group, Inc.,* 171

20   Cal.App.4th 1305, 1335, 90 Cal.Rptr.3d 589 (2009). "A private plaintiff must make a

21   twofold showing: he or she must demonstrate injury in fact *and* a loss of money or

22   property caused by unfair competition." *Peterson v. Cellco Partnership* 164

---

23   [11] This Court already has held that Headley's attempt to plead a claim as a

24   "representative" of "others similarly situated" (SAC ¶¶ 7, 14) fails to state a valid

25   claim because Headley fails to comply with pleading and other rules related to

     bringing a class action. Order of August 12, 2009 (Document 32), at 6, n. 3. In any

26   event, plaintiff could not pursue a class action for the very reason that she is and

27   cannot be a part of the affected class. See discussion in text, *post.*

28                                       - 37 -

JMBM | Jeffer Mangels Butler & Marmaro LLP

1  Cal.App.4th 1583, 1590, 80 Cal.Rptr.3d 316 (2008).  Plaintiff simply did not suffer

2  the kind of injury in fact necessary to bring an action under the UCL.

3      Second, plaintiff fails to meet the standing requirements of Article III of the

4  Constitution.  To satisfy Article III's standing requirements, a plaintiff in a federal

5  court action must show that (1) she has suffered an "injury in fact" that is concrete,

6  particularized, and actual (or imminent) rather than conjectural or hypothetical; (2)

7  the injury is fairly traceable to the challenged action of the defendants; and (3) it is

8  likely, as opposed to speculative, that the injury will be redressed by a favorable

9  decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.,* 528 U.S.

10  167, 180-81 (2000); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

11      In particular, where, as here, a plaintiff seeks injunctive relief, she must show

12  that she requires such relief to protect herself against a recurrence of the conduct

13  alleged, *i.e.,* that she is "realistically threatened by a *repetition* of the violation." *Gest*

14  *v. Bradbury,* 443 F.3d 1177, 1181 (9th Cir. 2006) (citing *Armstrong v. Davis,* 275

15  F.3d 849, 860-61 (9th Cir. 2001) (emphasis in original)). *See O'Shea v. Littleton,* 414

16  U.S. 488, 495-96 (1974)("Past exposure to illegal conduct does not in itself show a

17  present case or controversy regarding injunctive relief . . . if unaccompanied by any

18  continuing, present adverse effects"; standing to seek injunctive relief requires a

19  showing of a likelihood of "real and immediate" harm to the plaintiff).

20      *Deitz v. Comcast Corp.,* 2006 WL 3782902 (N.D. Cal. Dec. 21, 2006), is

21  illustrative.  The district court held a plaintiff lacked standing to seek injunctive relief

22  regarding cable services because he was no longer a cable subscriber and had "not

23  demonstrated there exists a *definitive likelihood* that he will once again become a

24  subscriber of defendants' cable services.... [P]laintiff's claims of possible future

25  injury are too speculative and attenuated to warrant prospective relief." *Id.* at *3

26  (emphasis added). *Accord, Stickrath v. Globalstar, Inc.,* 527 F. Supp.2d 992, 995-97

27  (N.D. Cal. 2007). As *Deitz* also held, the requirement that a plaintiff personally be

28

- 38 -

JMBM | Jeffer Mangels
Butler & Marmaro LLP

1    subject to potential repetition of the conduct cannot be avoided by pleading a class

2    action, which in any event, as this court has held, plaintiff here has not properly done.

3    Unless the named plaintiff is herself entitled to seek injunctive relief, she "may not

4    represent a class seeking that relief." *Hodgers-Durgin v. de la Vina,* 199 F.3d 1037,

5    1045 (9th Cir. 1999). "Any injury that unnamed members of the proposed class may

6    have suffered is irrelevant to the question whether [the] named plaintiff is entitled to

7    the injunctive relief he seeks." *Deitz .* at * 4.

8        The Article III standing requirement is constitutionally mandated and applies to

9    all cases pending in the federal courts, even cases where the underlying claim is

10   based upon state law and even if the case has been removed to federal court:

11           No state legislature can override Article III. No state legislature may attempt

12           to confer jurisdiction on a federal court. . . . When a case is filed in a federal

13           court or when a case is removed to a federal court, the federal court is bound

14           by Article III. The state legislature may no more allow injunctive relief in this

15           case than were it to pass a statute allowing courts to give advisory opinions.

16   *Deitz v. Comcast Corp.,* at * 4. Thus in *Deitz,* the plaintiff's claims under Cal. UCL

17   §17200, which had been removed to federal court, were dismissed for failure to meet

18   Article III standing requirements.

19       In this case, plaintiff simply does not allege a case or controversy for injunctive

20   relief under Article III because she cannot show that she is "realistically threatened

21   by a *repetition* of the [alleged] violation." *Gest v. Bradbury,* 443 F.3d 1177, 1181

22   (9th Cir. 2006). Plaintiff has left the Sea Org, left CSI and RTC, and renounced

23   Scientology. Since she left, she has had two children, and is free, as she always has

24   been, to have as many more as she chooses. There is literally zero possibility or

25   threat that defendants could interfere with her choices, let alone that they would ever

26   try. Plaintiff's second cause of action for injunctive relief must be dismissed.

27

28

                                        - 39 -

## CONCLUSION

For all the foregoing reasons, the Defendants' joint motion for summary judgment dismissing Plaintiff's second and third claims for relief should be granted.

May 19, 2010                                   Respectfully Submitted,

                                               JEFFER, MANGELS, BUTLER &
                                               MARMARO LLP
                                               By: _____/s/_____
                                               Marc Marmaro
                                               *Attorneys for Defendant Religious*
                                               *Technology Center*

                                               RABINOWITZ, BOUDIN, STANDARD,
                                               KRINSKY & LIEBERMAN, P.C.
                                               By: _____/s/_____
                                               Eric M. Lieberman

                                                  – and –

                                               PROSKAUER ROSE LLP
                                               By: _____/s/_____
                                               Harold M. Brody
                                               *Attorneys for Defendant Church of*
                                               *Scientology International*

- 40 -