F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1  BARRY VAN SICKLE, ESQ., SBN 98645
   1079 SUNRISE AVENUE, SUITE B-315
2  ROSEVILLE, CA 95661
   TELEPHONE: (916) 549-8784
3  EMAIL: barryvansickle@comcast.net

4  METZGER LAW GROUP
   A PROFESSIONAL LAW CORPORATION
5  RAPHAEL METZGER, ESQ., SBN 116020
   KATHRYN DARNELL, ESQ., SBN 251364
6  401 E. OCEAN BLVD., SUITE 800
   LONG BEACH, CA  90802-4966
7  TELEPHONE:  (562) 437-4499
   TELECOPIER: (562) 436-1561
8  WEBSITE:  www.toxictorts.com

9  Attorneys for Plaintiff
   CLAIRE HEADLEY

10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13

14  CLAIRE HEADLEY,                )  CASE NO. CV09-3987 DSF (MANx)
                                   )
15              Plaintiff,         )  **PLAINTIFF'S  MEMORANDUM**
                                   )  **OF POINTS AND AUTHORITIES**
16       vs.                       )  **I N   O P P O S I T I O N   T O**
                                   )  **DEFENDANTS' JOINT MOTION**
17  CHURCH OF SCIENTOLOGY          )  **FOR SUMMARY JUDGMENT**
    INTERNATIONAL, a corporate entity, )
18  RELIGIOUS TECHNOLOGY           )  DATE:      August 2, 2010
    CENTER, a corporate entity AND )  TIME:      1:30 p.m.
19  DOES 1-20,                     )  DEPT:      840
                                   )
20              Defendants.        )
    _____ )
21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

MEMORANDUM OF POINTS AND AUTHORITIES................................ 1

1.    PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT........................................... 1

2.    STATEMENT OF FACTS............................... 2

    A.    Claire Headley................................. 2

        (1).    Experience in the Sea Organization............ 2

        (2).    Physical Abuse............................. 3

        (3).    Verbal Abuse and Degrading Punishments....... 4

        (4).    Controls on Communication.................. 6

        (5).    Security Measures.......................... 8

        (6).    Pursuing Sea Organization Members Who Left.. 10

        (7).    Plaintiff's Abortions....................... 13

        (8).    Plaintiff Believed She Could Not Leave Gold Base ................................. 16

        (9).    Plaintiff's Escape......................... 16

    B.    Plaintiff Is A Victim Of Human Trafficking.......... 17

    C.    The Scripture, Beliefs, and Formal Policies of the Church of Scientology Prohibit Human Trafficking And Forced Labor...................................... 18

3.    PURSUANT TO APPLICABLE FEDERAL CASE LAW, THE MINISTERIAL EXCEPTION DOES NOT APPLY TO HUMAN TRAFFICKING CLAIMS........................... 21

4.    THERE CAN BE NO FIRST AMENDMENT FREE EXERCISE DEFENSE IN THE ABSENCE OF A CONFLICT BETWEEN RELIGIOUS BELIEF AND THE CONDUCT CHALLENGED ................................. 23

5.    NO CONFLICT EXISTS BETWEEN THE SCIENTOLOGY RELIGION AND THE LAW OF HUMAN TRAFFICKING BECAUSE THE CHURCH OF SCIENTOLOGY PROHIBITS HUMAN TRAFFICKING........................... 26

i

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

6.   DEFENDANTS' ARGUMENT THAT ALLOWING
     PLAINTIFF'S HUMAN TRAFFICKING CLAIM WOULD
     VIOLATE THE ESTABLISHMENT CLAUSE FAILS,
     BECAUSE THERE CAN BE NO ENTANGLEMENT OF
     RELIGION AND GOVERNMENT WHERE THE CHURCH
     PROHIBITS HUMAN TRAFFICKING
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

7.   ASSUMING, ARGUENDO, THAT DEFENDANTS
     SOMEHOW COULD ASSERT A FIRST AMENDMENT
     DEFENSE, THE DEFENSE FAILS BECAUSE THE FIRST
     AMENDMENT ONLY PROTECTS RELIGIOUS BELIEFS,
     NOT UNLAWFUL CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . 29

8.   DEFENDANTS' ATTEMPTS TO CHARACTERIZE
     THE TVPA AS AN ORDINARY EMPLOYMENT
     STATUTE FAIL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

9.   THE LIMITATIONS DEFENDANT SEEKS TO IMPOSE
     ON PLAINTIFF'S HUMAN TRAFFICKING CLAIM
     ARE IMPROPER AND UNDERMINE THE ENTIRE
     INTENT OF THE TVPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

10.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ii

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*Elvig v. Calvin Presbyterian Church*
  375 F.3d 951, 959 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . 24, 25, 28

*Alicea-Hernandez v. Catholic Bishop of Chi.*
  320 F.3d 698, 703 (7th Cir.2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bollard v. California Province of the Society of Jesus*
  196 F.3d 940, 947 (9th Cir. 1999). . . . . . . . . . . . . . . . 1, 24, 25, 28, 29

*EEOC v. Pacific Press Publ'g Ass'n'*
  676 F.2d 1272, 1279 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . 24

*Grove v. Mead School Dist. No. 354*
  753 F.2d 1528, 1533 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lemon v. Kurtzman*
  403 U.S. 602, 612 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Malik v. Brown*
  16 F.3d 330, 333 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Petruska v. Gannon University*
  448 F.3d 615, 620 (3rd Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 25, 28

*Rayburn v. Gen. Conf. Of Seventh-Day Adventists*
  772 F.2d 1164, 1171 (4th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 30

*Sherbert v. Verner*
  374 U.S. 398, 402-03 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Shukla v. Sharma*
  No. 07-CV-2972 (CBA), at *1 (E.D.N.Y. Sept. 29, 2009).   1, 21, 23, 32

*Turner v. Unification Church,*
  473 F.Supp. 367, 371-72 (D. R.I. 1978). . . . . . . . . . . . . . . . . . . . . 29-31

*United States v. Bradley*
  390 F.3d 145, 156-57 (1st Cir. 2004). . . . . . . . . . . . . . . . . . . . . . 22, 33

*United States v. Calimlim*
  538 F. 3d 706, 714 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 22, 33

*United States v. Garcia*
  No. 02 CR 110S-01, 2003 WL 22956917, at *4 (W.D.N.Y. Dec. 2,
  2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Kozminski*
  487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). . . . . . . . . . 33

iii

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

*Walz v. Tax Comm'n*
            397 U.S. 664, 668 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

## **FEDERAL STATUTES**

18 U.S.C.
            §1584 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

            § 1593(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

            § 1859 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

Fair Labor Standards Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 32

First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 23-25, 28-30

Religious Freedom Restoration Act ("RFRA"). . . . . . . . . . . . . . . . . . . . . . .  33

H.R. Conf. Rep. 106-939
            §102(b)(22),(23) (October 2000). . . . . . . . . . . . . . . . . . . . . . . . .  23, 33

Victims of Trafficking and Violence Protection Act of 2000 ("TVPA")
            18 U.S.C. §§ 1589. . . . . . . . . . . . . . . . . . . . . . . . .  1, 17, 20-22, 27, 32-34

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.         PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT**

The Court should deny the Joint Motion for Summary Judgment filed by Defendants, Church of Scientology International ("CSI") and Religious Technology Center ("RTC"), for three simple reasons.

First, applicable federal case law makes clear that the ministerial exception does not apply to claims asserted under the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18 U.S.C. §§ 1589, *et seq.  See Shukla v. Sharma*, No. 07-CV-2972 (CBA), at *1 (E.D.N.Y. Sept. 29, 2009) (adopting Report and Recommendation dated August 21, 2009).  While the TVPA was enacted to protect individual liberty and prevent conduct that is extreme, offensive, and contrary to fundamental human rights, the ministerial exception is intended to address ordinary violations of labor and employment laws - two very different concepts.

Second, a First Amendment defense can only be asserted where there is a conflict between religion and the conduct being regulated. *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 947 (9th Cir. 1999).  In the absence of such a conflict, the freedoms that the First Amendment was established to protect are absent. *Id.*

Third, as demonstrated in detail below, there is no conflict between the Scientology religion and the conduct that Plaintiff, Claire Headley,  challenges through her human trafficking claim because Defendants officially prohibit human trafficking, forced labor, and involuntary confinement.  In fact, "Scientologists, as a general rule, are ***opposed of any human rights violation***:  Anything that violates an individual's right to choose, anything that would reduce a person's freedom, individual[ity], and ability to think for themselves."  (Deposition of Thomas Davis ("Davis Depo."), attached as <u>Exhibit "L"</u> to the Darnell Decl., 104:25-105:14).

1

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

2.        **STATEMENT OF FACTS**

    A.    **Claire Headley**

    (1).    **Experience in the Sea Organization**

Claire Headley first became involved in the Scientology religion at age four when her mother joined the Sea Organization. (Deposition of Claire Headley ("C. Headley Depo."), 20:6-16; 23:20-24:7, attached as Exhibit "Q" to the Declaration of Kathryn Darnell ("Darnell Decl.")). From age four to eight, she lived at Scientology's Cadet Org where she was supervised by staff and performed weeding, cleaning, and was bused to and from school. (C. Headley Depo., 25:2-26:13, attached as Exhibit "Q" to the Darnell Decl.). During this time period, she only saw her mother for a few hours a week, and on at least one occasion, did not see her mother for several months. (C. Headley Decl., 26:13-27:18, attached as Exhibit "Q" to the Darnell Decl.).

By age sixteen, Mrs. Headley signed a billion year contract with the Sea Organization. (C. Headley Decl., 77:8-78:24; 91:8-10, attached as Exhibit "Q" to the Darnell Decl.). She briefly worked in Los Angeles, and then moved to Scientology's International Headquarters ("Gold Base") in Gilman Hot Springs, California. (C. Headley Depo., 122:1-21, attached as Exhibit "Q" to the Darnell Decl.). She also worked for a brief period of time in the 1990s in Clearwater, Florida. (C. Headley, Depo., 380:22-381:22, attached as Exhibit "R" to the Darnell Decl.).

Over the course of her fourteen years in the Sea Organization, Claire Headley endured both psychological and physical abuse causing her to believe that she could not leave the Sea Organization, and that if she attempted to leave and stop performing work for Defendants, she would suffer serious harm or physical detention. (Declaration of Robert V. Levine, Ph.D.) This abuse and manipulation is described below.

//

2

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

### (2).   Physical Abuse

Mrs. Headley experienced and observed instances of physical abuse at Gold Base on a number of occasions.  In the early to mid-1990s, one of her coworkers yelled and screamed at her, and then shoved her.  (C. Headley Depo., 183:25-184:22, attached as Exhibit "Q" to the Darnell Decl.).  Mrs. Headley also recalls attending meetings where David Miscavige, the leader of the Church of Scientology, assaulted coworkers in her presence.  (C. Headley Decl., ¶ 8; *see also* C. Headley Depo., 279:6-22, attached as Exhibit "Q" to the Darnell Decl.).  Mr. Miscavige's actions included grabbing individuals from behind the neck, bashing coworkers' heads together, and shoving staff members.  (C. Headley Decl., ¶ 8).  Several staff members who were shoved by Mr. Miscavige actually fell down or into a table.  (C. Headley Decl., ¶ 8).  Mrs. Headley recalls at least fifty occasions when Mr. Miscavige assaulted coworkers in her presence from 1996 onward.  (C. Headley Decl., ¶ 8).  Mrs. Headley prepared a report in 2002 documenting numerous instances of physical abuse perpetrated by Marty Rathbun, a former high-ranking Sea Organization member.  (C. Headley Decl., ¶ 9; *see also* Davis Depo., 67:10-18, attached as Exhibit "L" to the Darnell Decl.).

Mrs. Headley's husband similarly was subjected to physical abuse in the Sea Organization and recalls seeing similar acts of physical violence perpetrated against coworkers.  (Declaration of Marc Headley ("M. Headley Decl."), ¶ 4; Deposition of Marc Headley ("M. Headley Depo."), 598:15-600:5, attached as Exhibit "D" to the Darnell Decl.; M. Headley Depo., 916:16-917:7, attached as Exhibit "E" to the Darnell Decl.).  During a meeting that Mr. an Mrs. Headley attended together with David Miscavige, Mr. Headley was escorted out of a meeting and interrogated after failing to "correctly" answer one of Mr. Miscavige's questions.  (M. Headley Decl., ¶ 4); (Declaration of Claire Headley ("C. Headley Decl."), ¶ 7).

Mrs. Headley's former coworkers also recall observing physical abuse at Gold Base.  Michael Norton testified that he observed several instances of physical

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1   violence and heard about other instances of physical abuse that occurred at Gold Base.

2   (Norton Depo., 79:17-80:8; 80:15-81:6; 81:16-82:4, attached as Exhibit "K" to the

3   Darnell Decl.).  Likewise, Maureen Bolstad testified that on a number of occasions

4   when she attempted to leave Gold Base, she was physically attacked and sustained a

5   broken arm.  (Deposition of Maureen Bolstad ("Bolstad Depo."), 169:9-19, attached as

6   Exhibit "J" to the Darnell Decl.; *see also* M. Headley Depo., 933:18-935:12; 937:8-17,

7   attached as Exhibit "E" to the Darnell Decl.).

8        Indeed, the Church of Scientology's official spokesperson admitted under

9   oath that from the time period of 2001 to 2004, at least fifty instances of physical abuse

10  occurred at Gold Base where Mrs. Headley worked.  (Davis Depo., 53:20-54:5; 54:21-

11  55:15; 55:24-57:3; 100:16-17; 102:3-8, attached as Exhibit "L" to the Darnell Decl.).

12  These acts of physical abuse were perpetrated by high-ranking officials within the Sea

13  Organization.  (Davis Depo., 77:9-78:4, attached as Exhibit "L" to the Darnell Decl.;

14  Deposition of Warren McShane ("McShane Depo."), 31:14-32:20, attached as Exhibit

15  "G", to the Darnell Decl.; C. Headley Decl., ¶ 9; Declaration of Marty Rathbun

16  ("Rathbun Decl."), ¶ 25).

17

18        **(3).   Verbal Abuse and Degrading Punishments**

19

20        Mrs. Headley and her coworkers also were subjected to a number of

21  degrading forms of verbal abuse and punishment.  Michael Norton testified that Gold

22  Base was an "angry environment" where there was lots of yelling and demoralizing

23  assignments unnecessarily given to staff members.  (Norton Depo., 106:16-107:7,

24  attached as Exhibit "K" to the Darnell Decl.).  These assignments included assigning

25  the executive council for Golden Era Productions to clean all of the bathrooms in the

26  manufacturing department, requiring an executive to clean the dumpsters outside the

27  food hall, and requiring executives to live in tents on the property.  (Norton Depo.,

28  107:8-108:2, attached as Exhibit "K" to the Darnell Decl.).  Mr. Norton also noted that

4

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    employees at Gold Base were yelled at on a daily basis and belittled; these instances of

2    verbal abuse became so frequent that Mr. Norton stated it was a "constant scenario."

3    (Norton Depo., 108:12-109:6, attached as <u>Exhibit "K"</u> to the Darnell Decl.).

4         Perhaps the most outrageous verbal abuse to which Mrs. Headley was

5    subjected occurred in 1995 at a meeting that she attended with David Miscavige. (C.

6    Headley Decl., ¶ 5). Commenting on certain purported mistakes that Mr. Headley made

7    during a trip to Clearwater, Florida, Mr. Miscavige told Mrs. Headley and others that

8    he had her husband returned to Gold Base "in a body bag." (C. Headley Decl., ¶ 5).

9    Although Mr. Headley ultimately was not returned in a body bag, he was assigned

10   heavy manual labor upon his return to Gold Base and was in terrible shape emotionally

11   upon his return. (C. Headley Decl., ¶ 5).

12        During another meeting, David Miscavige grabbed the back of Mrs.

13   Headley's pants and made her drag him across a room to demonstrate to her and others

14   that they were his ball and chain. (C. Headley Depo, 184:25-185:17, attached as

15   <u>Exhibit "Q"</u> to the Darnell Decl.). This was a humiliating and physically exhausting

16   experience. (C. Headley Depo., 186:3-6, attached as <u>Exhibit "Q"</u> to the Darnell Decl.).

17        Mrs. Headley also was denied food privileges for lengthy periods of time,

18   frequently was required to sleep at her work station on the Gold Base, and was assigned

19   heavy manual labor. (C. Headley Depo., 138:4-12; 141:12-15; 141:21-142:6, attached

20   as <u>Exhibit "Q"</u> to the Darnell Decl.; C. Headley Depo., 881:13-882:23, attached at

21   <u>Exhibit "T"</u> to the Darnell Decl.). As a result of some of these punishments, she lost

22   significant weight and was emaciated and sleep deprived by the time she finally

23   escaped Gold Base. (C. Headley Depo., 594:3-16; 665:4-8, attached as <u>Exhibit "S"</u> to

24   the Darnell Decl.).

25        Mrs. Headley also observed her coworkers being made to divorce, clean

26   human excrement out of ponds, subjected to verbal abuse, restricted to Gold Base for

27   months on end, required to sleep in sleeping bags at their work stations, and not being

28   allowed to leave to eat or shower. (C. Headley Depo., 279:6-279:22, attached as

5

1   Exhibit "Q" to the Darnell Decl.).  Indeed, Mrs. Headley was told on several occasions

2   that she needed to divorce her husband.  This was first suggested at a meeting in 2000,

3   when David Miscavige informed staff members of a personnel policy that he was

4   considering implementing that would require her to divorce her husband to remain an

5   employee of RTC.  (C. Headley Depo., 877:25-879:6, attached at Exhibit "T" to the

6   Darnell Decl.).  In 2004, this policy became official and Mrs. Headley was told that she

7   had to divorce her husband to remain at RTC.  (C. Headley Depo., 227:6:229:18,

8   attached as Exhibit "Q" to the Darnell Decl.; C. Headley Decl., ¶ 4; McShane Depo.,

9   93:1-8, attached as Exhibit "G" to the Darnell Decl.).  After Mrs. Headley's husband

10  escaped Gold Base, she again was told that she needed to divorce him. (C. Headley

11  Depo., 524:8-17, attached as Exhibit "R" to the Darnell Decl.).

12

13                    **(4).    Controls on Communication**

14

15          Mrs. Headley and her coworkers did not have uncensored access to mail;

16  incoming and outcoming mail was censored.  (Fraser Depo., 102:10-105:8, attached as

17  Exhibit "H" to the Darnell Decl.; C. Headley Depo., 137:11-12, attached as Exhibit "Q"

18  to the Darnell Decl.;  C. Headley Depo., 849:19-24;  851:10-14;  852:10-24;

19  854:23-858:18;  860:9-20;  861:1-862:2;  862:19-863:5;  865:14-867:12, attached as

20  Exhibit "T" to the Darnell Decl.).   Additionally, personal telephone calls were

21  monitored by a third person, and Mrs. Headley and her coworkers were required to

22  obtain permission before making personal phone calls.  (Fraser Depo., 106:13-16;

23  107:24-110:10, attached as Exhibit "H" to the Darnell Decl.; C. Headley Depo., 137:11-

24  12,  attached as Exhibit "Q" to the Darnell Decl.;  C. Headley Depo., 842:4-10;

25  841:25-842:10; 846:7-12, attached as Exhibit "T" to the Darnell Decl.).  Finally, Mrs.

26  Headley and her coworkers had limited access to email.  To use the internet, Sea

27  Organization members at Gold Base were required to ask and receive permission.

28  (Fraser Depo., 100:11-24, attached as Exhibit "H" to the Darnell Decl.).

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    On at least one occasion, Mrs. Headley was pressured and threatened with
2    punishment if she did not write a threatening letter to her husband to "get his act
3    together" and get out of trouble for whatever he had done previously.  (C. Headley
4    Depo., 868:9-869:2, attached as Exhibit "T" to the Darnell Decl.).  Mrs. Headley knew
5    that all of her communications were filtered by Defendants, and only included
6    statements in her letters that she knew would be sent along to her family members.  (C.
7    Headley Depo., 849:14-852:15, attached as Exhibit "T" to the Darnell Decl.).  Her
8    family did not even know where Gold Base was located, and was not allowed to know
9    this information.  (C. Headley Depo., 854:11-22, attached as Exhibit "T" to the Darnell
10   Decl.).

11       Mrs. Headley and her coworkers also were strictly prohibited from
12   communicating any desire to leave Gold Base.  (C. Headley Depo., 541:2-5, attached
13   as Exhibit "R" to the Darnell Decl.).  They were told that it was a major transgression
14   to want to leave, and that if it was discovered that they thought about leaving, they
15   would be placed on heavy manual labor and placed under security watch.  (C. Headley
16   Depo., 541:5-11, attached as Exhibit "R" to the Darnell Decl.; Deposition of Astra
17   Woodcraft ("Woodcraft Depo."), 74:10-20, attached as Exhibit "M" to the Darnell
18   Decl.).  Additionally, they would be separated from their spouses, interrogated, and
19   restricted to the Gold Base property.  (C. Headley Depo. 541:11-19, attached as Exhibit
20   "R" to the Darnell Decl.).

21       Sea Organization members also were told it was a "high crime" to call the
22   police, and Mrs. Headley believed that dire consequences would result if she attempted
23   to call 911.  (C. Headley Depo., 139:2-5; 139:7-140:10, attached as Exhibit "Q" to the
24   Darnell Decl.).  Indeed, she feared that if she called 911, she would lose all contact with
25   her family, that she would be put on heavy manual labor, that she would be stripped of all
26   rights, that she would be ostracized from everyone at Gold Base, that she would have
27   no access to outside phone lines for a year or two, that she would not be allowed to
28   leave the property without a security escort, and that she would be assigned a full-time

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

1    security watch.  (C. Headley Depo., 525:19-526:16, attached as Exhibit "R" to the

2    Darnell Decl.).  Mrs. Headley further believed that if she called 911, the police would

3    never get past the security at the property.  (C. Headley Depo., 531:4-8, attached as

4    Exhibit "R" to the Darnell Decl.).  Indeed, the corporate designee for the CSI testified

5    that she could not recall anytime when the police were called to Gold Base for

6    something that occurred within the perimeter fence at Gold Base or that concerned a

7    Sea Organization member.  (Fraser Depo., 97:15-98:10, attached as Exhibit "H" to the

8    Darnell Decl.).

9            Defendants' control over Mrs. Headley's ability to communicate played

10   a significant factor in the psychological coercion of Mrs. Headley that ultimately caused

11   her to believe that she could not leave Gold Base.  (Levine Decl., ¶¶ 36-44; 93).

12

13               **(5).    Security Measures**

14

15           Extensive security measures were put in place at Gold Base to prevent

16   Mrs. Headley and her coworkers from leaving.  Gold Base is 500 acre piece of property

17   surrounded by a perimeter fence.  (Fraser Depo., 31:14-23, 66:23-67:18, attached as

18   Exhibit "H" to the Darnell Decl.; Davis Depo., 186:12-188:12, attached as Exhibit "L"

19   to the Darnell Decl.).  Security cameras were located along the perimeter fence.  (Fraser

20   Depo., 65:6-11, attached as Exhibit "H" to the Darnell Decl.; Norton Depo., 65:13-

21   66:22; 68:25-69:19, attached as Exhibit "K" to the Darnell Decl.).  Additionally, the

22   perimeter fence was equipped with motion detectors, flood lights, and "shaker" type

23   devices that detect whether or not the fence was moved. (Fraser Depo., 65:6-66:22;

24   67:21-22; 69:18-25, attached as Exhibit "H" to the Darnell Decl.; Norton Depo., 59:6-

25   9; 69:20-71:3, attached as Exhibit "K" to the Darnell Decl.; McShane Depo., 79:23-24,

26   attached as Exhibit "G" to the Darnell Decl.).  Portions of the perimeter fence also were

27   topped with spikes that face both inward and outward.  (Fraser Depo., 68:11-24,

28   attached as Exhibit "H" to the Darnell Decl.; McShane Decl., 79:25-80:3, attached as

1   Exhibit "G" to the Darnell Decl.)  On at least one occasion, the motion sensors on the

2   fence sounded an alarm when a staff member attempted to climb the fence and leave;

3   this caused security to initiate a "blow drill" which is discussed in greater detail later.

4   (Norton Depo., 59:23-61:4, attached as Exhibit "K" to the Darnell Decl.).

5          Security guards were present at Gold Base twenty-four hours a day during

6   Mrs. Headley's employment.  (Fraser Depo., 62:14-63:3, attached as Exhibit "H" to the

7   Darnell Decl.; McShane Depo. 78:24-79:5, attached as Exhibit "G" to the Darnell

8   Decl.).  These security guards carried handcuffs, batons, and mace.  (Fraser Depo.,

9   63:6-15; 65:2; 78:2-9, attached as Exhibit "H" to the Darnell Decl.; Norton Depo.,

10  75:12-17; 75:22-25, attached as Exhibit "K" to the Darnell Decl.; Deposition of Daniel

11  Dunigan ("Dunigan Depo."), 68:18-69:5; 181:13-18, attached as Exhibit "N" to the

12  Darnell Decl.).  Some of the security guards also carried firearms, and an attack dog

13  was assigned to the security detail at Gold Base.  (Norton Depo., 74:1-13; 76:14-77:8,

14  attached as Exhibit "K" to the Darnell Decl.; Dunigan Depo., 22:4-24:18; 41:19-21;

15  83:3-86:15, attached as Exhibit "N" to the Darnell Decl.).

16         Moreover, there also was an observation post on the hillside near Gold

17  Base containing cameras that monitored and scanned the entire Gold Base property.

18  (Davis Depo., 186:12-188:12, attached as Exhibit "L" to the Darnell Decl.).

19         By 2001 or 2002, a security camera was installed on top of Mrs. Headley's

20  house by one of the security guards that worked at Gold Base.  (Norton Depo., 55:9-21;

21  57:4-57:17, attached as Exhibit "K" to the Darnell Decl.) If Mrs. Headley drove down

22  the road away from her house, she easily could be detected by the security camera.  (See

23  M. Norton Depo., 110:5-23, attached as Exhibit "K" to the Darnell Decl.; C. Headley

24  Depo., 160:15-161:1, attached as Exhibit "Q" to the Darnell Decl.).  Security also was

25  present at some of the locations that Mrs. Headley lived, and if staff members at Gold

26  Base did not arrive to work on any given day, security guards or other personnel were

27  dispatched to locate these workers.  (See C. Headley Depo., 147:21-148:20, attached

28  as Exhibit "Q" to the Darnell Decl.).

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    "Perimeter Council" meetings were regularly held at the Gold Base

2    property.  During these meetings individuals who were of "concern" were discussed,

3    including individuals who wanted to leave.  (Fraser Depo., 87:17-88:4, attached as

4    Exhibit "H" to the Darnell Decl.).  In fact, security guards were instructed to keep a

5    close eye on individuals who were believed to want to leave the Sea Organization.

6    (Norton Depo., 71:10-72:14, attached as Exhibit "K" to the Darnell Decl.).

7    Sea Organization members were often not allowed to leave Gold Base

8    without an escort if they were viewed as being at risk of leaving the Sea Organization.

9    (See Fraser Depo., 123:4-8; 123:23-124:9, attached as Exhibit "H" to the Darnell Decl.;

10   Norton Depo., 73:7-73:25, attached as Exhibit "K" to the Darnell Decl.; M. Headley

11   Depo., 582:24-585:16, attached as Exhibit "D" to the Darnell Decl.).

12   Additionally, "musters" were regularly held at Gold Base to account for

13   the whereabouts of every single staff member.  (Fraser Depo., 129:1-17; 132:8-19,

14   attached as Exhibit "H" to the Darnell Decl.).

15   These security measures caused Mrs. Headley to believe that leaving Gold

16   Base would be physically difficult, dangerous, and likely unsuccessful.  (Levine Decl.,

17   ¶¶ 59-62).  As such, these security measures were a factor in Defendants' psychological

18   coercion of Mrs. Headley.  (Levine Decl., ¶¶ 16, 86-101).

19

20   **(6).    Pursuing Sea Organization Members Who Left**

21

22   Defendants engage in what it referred to as a "blow drill" anytime a

23   member of the Sea Organization leaves Gold Base without prior permission.  (Norton

24   Depo., 26:17-28:17; 48:1-4, attached as Exhibit "K" to the Darnell Decl.).  The purpose

25   of these blow drills is to locate the individual who has left and get the person to return

26   to Gold Base.  (McShane Depo., 84:23-85:23; 86:13-14, attached as Exhibit "G" to the

27   Darnell Decl.; Fraser Depo., 138:24-139:12, attached as Exhibit "H" to the Darnell

28   Decl.; Woodcraft Depo., 79:4-80:23, attached as Exhibit "M" to the Darnell Decl.).

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    During blow drills, individuals are pursued, and their whereabouts are
2    tracked by a variety of methods. (Norton Depo., 32:6-18; 36:4-37:13; 48:19-50:16,
3    attached as Exhibit "K" to the Darnell Decl.; *see also* C. Headley Depo., 389:18-390:5,
4    attached as Exhibit "R" to the Darnell Decl.; Woodcraft Depo., 79:7-17, attached as
5    Exhibit "M" to the Darnell Decl.; Rathbun Decl., ¶¶ 11-15). These methods include
6    tracking the checking, credit and financial accounts of individuals, researching their
7    travel plans, and placing phone calls to determine an individual's location. (Norton
8    Depo., 36:4-37:13; 48:19-50:16, attached as Exhibit "K" to the Darnell Decl.).
9    Anywhere from thirty to seventy people could be dispatched to track the every move
10   of someone who left. (C. Headley Depo., 495:7-496:24; 510:14-21, attached as Exhibit
11   "R" to the Darnell Decl.). After an individual is located, efforts are made to "persuade"
12   them to return to Gold Base, which sometimes involves physical coercion. (*See* Norton
13   Depo., 42:10-44:14, attached as Exhibit "K" to the Darnell Decl.; *see also* Bolstad
14   Depo., 169:9-19, attached as Exhibit "J" to the Darnell Decl.; *see also* Dunigan Depo.,
15   222:8-12, attached as Exhibit "O" to the Darnell Decl.; C. Headley Depo., 195:6-18,
16   attached as Exhibit "Q" to the Darnell Decl.; Rathbun Decl., ¶¶ 11-15).

17   On a number of occasions when Sea Organization members attempted to
18   leave Gold Base, they were captured and returned. (M. Headley Depo., 926:18-949:22,
19   attached as Exhibit "E" to the Darnell Decl.; C. Headley Depo., 148:21-154:19;
20   155:1-17; 193:11-199:13, attached as Exhibit "Q" to the Darnell Decl.). One of Mrs.
21   Headley's coworkers drove a car through the security gate at Gold Base to get out. (M.
22   Headley Depo., 932:12-933:3, attached as Exhibit "E" to the Darnell Decl.; McShane
23   Depo., 66:3-68:17, attached as Exhibit "G" to the Darnell Decl.). Several of Mrs.
24   Headley's coworkers were physically restrained and returned to the property. (M.
25   Headley Depo., 933:18-935:12; 937:8-17, attached as Exhibit "E" to the Darnell Decl.;
26   Bolstad Depo., 80:9-19; 169:9-19, attached as Exhibit "J" to the Darnell Decl.; C.
27   Headley Depo. 195:6-18, attached as Exhibit "Q" to the Darnell Decl.). Other workers
28   were intercepted by Sea Organization members at a bus station and convinced to return

11

1   to Gold Base; upon their return, they were assigned hard labor.  (M. Headley Depo.,
2   938:21-939:25, attached as Exhibit "E" to the Darnell Decl.).   One worker attempted
3   to leave the Sea Organization on several occasions and was returned,  each time being
4   placed under 24-hour surveillance.  (M. Headley Depo., 940:6-942:22, attached as
5   Exhibit "E" to the Darnell Decl.).  Indeed, as a general rule, anyone who left Gold Base
6   without permission and was returned, was restricted to the property and assigned
7   manual labor. (Norton Depo., 82:3-10; 82:13-83:10, attached hereto as Exhibit "K" to
8   the Darnell Decl.; C. Headley Depo., 154:6-16, attached as Exhibit "Q" to the Darnell
9   Decl.).

10          Additionally, Mrs. Headley observed that after her coworker, Tanja Castle,
11   attempted to leave, she was placed on heavy manual labor, isolated from other workers,
12   not allowed to leave Gold Base for any reason, and was assigned a permanent guard.
13   (C. Headley Depo., 260:18-262:2, attached as Exhibit "Q" to the Darnell Decl.).
14   Additionally, Mrs. Castle was locked in a room with Mike Rinder and Warren
15   McShane, high ranking Sea Organization members, during which these men yelled and
16   screamed at Ms. Castle and told her that she was never going to be able to see her
17   husband again. (C. Headley Depo., 261:1-25, attached as Exhibit "Q" to the Darnell
18   Decl.).  Mrs. Headley also was forced to try to convince Mrs. Castle to stay and to
19   divorce her husband. (C. Headley Depo., 264:3-265:25, attached as Exhibit "Q" to the
20   Darnell Decl.).

21          Many of Mrs. Headley's coworkers at Gold Base also recall being
22   prevented from leaving.  Michael Norton testified that he attempted to leave Gold Base
23   in 2003, and that staff members at Gold Base attempted to physically prevent him from
24   leaving.  (Norton Depo., 84:8-85:4, attached as Exhibit "K" to the Darnell Decl.).   In
25   fact, he was physically prevented access to his motorcycle when he attempted to leave.
26   (Norton Depo., 85:5-86:3, attached as Exhibit "K" to the Darnell Decl.).   Maureen
27   Bolstad also testified to being prevented from leaving, and to being restricted to a trailer
28   on a corner of the property for a period of time.  (Bolstad Depo., 80:9-19; 127:23-

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    128:4; 164:10-20; 169:9-19, attached as <u>Exhibit "J"</u> to the Darnell Decl.).

2           As recent as April of this year, the Church of Scientology dispatched a

3    team of four individuals to Texas to pursue a Sea Organization member who left Gold

4    Base a few days earlier without permission.  (Incident Report, 6/8:43-47, attached as

5    <u>Exhibit "P"</u> to the Darnell Decl.; Davis Depo., 194:13-15, attached as  <u>Exhibit "L"</u> to

6    the Darnell Decl.).    To determine the whereabouts of this individual, private

7    investigators were hired, who then tracked this individual to a motel in Texas.  (Incident

8    Report, 6/8:30-36, attached as <u>Exhibit "P"</u> to the Darnell Decl.).  Once his whereabouts

9    were determined, these four Sea Organization members flew to Texas, arrived

10   unannounced at the individuals's motel at 5:30 in the morning, and then attempted to

11   persuade this individual to return to the Sea Organization.  (Davis Depo., 17:8-18:9,

12   attached as <u>Exhibit "L"</u> to the Darnell Decl.; Incident Report, 6/8:45-46, attached as

13   <u>Exhibit "P"</u> to the Darnell Decl.).  Despite the insistence of one of these four Sea

14   Organization members that he was not "sent" by anyone at the Church to pursue the

15   individual who had blown the Sea Organization, an Incident Report filed with the

16   Riverside County Sheriff confirms that these four Scientology staff members were

17   summoned and sent to "persuade" this individual to return to the Sea Organization.

18   (Davis Depo., 22:5-9, attached as <u>Exhibit "L"</u> to the Darnell Decl.; Incident Report,

19   6/8:43-46, attached as <u>Exhibit "P"</u> to the Darnell Decl.).

20          Additionally, the passports of Sea Organizations members were locked up

21   at Gold Base, preventing Sea Organization members from freely coming and going.

22   (*See* Fraser Depo., 78:7-8, attached as <u>Exhibit "H"</u> to the Darnell Decl.).

23

24          **(7).    Plaintiff's Abortions**

25

26          Mrs. Headley was coerced into having two abortions during her time the

27   Sea Organization.  (C. Headley Depo., 734:20-25, attached as <u>Exhibit "S"</u> to the Darnell

28   Decl.).  The first abortion occurred when Mrs. Headley was only nineteen years old

13

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    while working at Gold Base. (C. Headley Depo., 735:1-15, attached hereto as <u>Exhibit</u>

2    <u>"S"</u> to the Darnell Decl.). She was ordered by the Medical Officer at Gold Base to have

3    an abortion and told that she would be placed on heavy manual labor and subjected to

4    interrogation if she did not have an abortion. (C. Headley Depo., 739:12-740:21;

5    760:15-762:9, attached as <u>Exhibit "S"</u> to the Darnell Decl.). She also was forbidden

6    from discussing her pregnancy with her husband, other than telling him that she was

7    pregnant and that they would both be in big trouble and she would be assigned heavy

8    manual labor if she did not have an abortion. (C. Headley Depo., 737:6-738:14,

9    attached as <u>Exhibit "S"</u> to the Darnell Decl.). Mrs. Headley was escorted to the abortion

10    clinic by male staff member and was coached in detail on how to respond to the

11    questions asked of her by staff at the abortion clinic. (C. Headley Depo., 764:21-765:8,

12    attached as <u>Exhibit "S"</u> to the Darnell Decl.). Mrs. Headley was extremely distraught

13    over this abortion, but feared that the consequences of not having an abortion were too

14    great. (C. Headley Depo., 764:8-767:3; 770:10-771:7, attached as <u>Exhibit "S"</u> to the

15    Darnell Decl.).

16          Mrs. Headley was coerced to undergo a second abortion in 1996 while

17    living away from her husband in Clearwater, Florida. (C. Headley Depo., 771:22-

18    772:2, attached as <u>Exhibit "S"</u> to the Darnell Decl.). After Mrs. Headley discovered

19    that she was pregnant in 1996, one of the staff members in Florida told her that she

20    would have to undergo an abortion and that they had already arranged for one of her

21    coworkers to loan her the money for the procedure. (C. Headley Depo., 773:12-774:7,

22    attached as <u>Exhibit "S"</u> to the Darnell Decl.). Mrs. Headley asked for permission to call

23    her husband in California to discuss her pregnancy and the demand that she have an

24    abortion, but this request was denied. (C. Headley Depo., 772:17-773:11, attached at

25    <u>Exhibit "S"</u> to the Darnell Decl.). Further, another staff member told her that she had

26    to have an abortion or else there would be severe consequences. (C. Headley Depo.,

27    777:13-778:4, attached as <u>Exhibit "S"</u> to the Darnell Decl.). After Mrs. Headley was

28    coerced to have her second abortion, she was interrogated at length by a staff member

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    to determine if she had intentionally become pregnant in an attempt to leave the Sea

2    Organization.  (C. Headley Depo., 774:10-777:12, attached as <u>Exhibit "S"</u> to the

3    Darnell Decl.).  Mrs. Headley believed that if it appeared in any way that she

4    intentionally became pregnant, that she would be removed from her position, separated

5    from her husband, and placed on heavy manual labor. (C. Headley Depo., 775:14-20,

6    attached as <u>Exhibit "S"</u> to the Darnell Decl.).

7              Although there was a written policy that Sea Org members would be sent

8    to a Class 5 organization, that policy was not utilized.  (C. Headley Depo., 746:3-21;

9    751:13-760:7, attached as <u>Exhibit "S"</u> to the Darnell Decl.; Woodcraft Depo., 110:6-10,

10   attached as <u>Exhibit "M"</u> to the Darnell Decl.).  Instead, women who became pregnant

11   were placed on heavy manual labor (washing large pots and pans in the mess hall,

12   digging ditches, or pulling weeds) and were interrogated to convince them not to leave,

13   and instead to have abortions.  (C. Headley Depo., 735:18-736:3; 751:13-753:25,

14   attached hereto as <u>Exhibit "S"</u> to the Darnell Decl.).  Mrs. Headley recalls at least three

15   coworkers who were placed on heavy manual labor after they became pregnant and

16   refused to have abortions; at least one of these women was placed on full-time security

17   watch.  (C. Headley Depo., 740:16-741:21; 743:14-744:8; 751:13-753:25, attached as

18   <u>Exhibit "S"</u> to the Darnell Decl.).  Other women were coerced to have abortions, and

19   Mrs. Headley recalls a long list of women in the Sea Organization who actually had

20   abortions.  (C. Headley Depo., 751:13-753:11; 754:1-760:7; 778:14-15, attached as

21   <u>Exhibit "S"</u> to the Darnell Decl.; C. Headley Depo., 902:11-910:4, attached as <u>Exhibit</u>

22   <u>"T"</u> to the Darnell Decl.).

23              Astra Woodcraft, a former member of the Sea Organization, also testified

24   that Defendants coerce women in the Sea Organization to have abortions.  (Woodcraft

25   Depo., 74:21-25, 109:18-110:13, attached as <u>Exhibit "M"</u> to the Darnell Decl.).  In fact,

26   she was specifically assigned the task of convincing women to have abortions so that

27   they would continue performing labor for Defendants.  (Woodcraft Depo., 74:21-25,

28   109:18-110:13, attached as <u>Exhibit "M"</u> to the Darnell Decl.).

15

### (8).   Plaintiff Believed She Could Not Leave Gold Base

Given the multitude of physical and mental restraints on Mrs. Headley's personal liberty detailed above, she believed that she was not free to stop working for Defendants or to leave Gold Base (Levine Decl., ¶¶ 86-101).  Mrs. Headley herself has articulated some of her beliefs regarding her ability to leave.

Specifically, she was told by her supervisor, Shelly Miscavige, that no one who worked for RTC would be allowed to leave, and that if they did, they would be brought back to Gold Base.  (C. Headley Depo., 811:4-13, attached as <u>Exhibit "T"</u> to the Darnell Decl.).  Additionally, although Mrs. Headley thought many times about leaving Gold Base, she never asked to leave because she knew the consequences would be too severe, including assignment to heavy labor, extensive interrogations, assignment of an escort to prevent her from leaving, separation from her husband, and restriction to Gold Base for a lengthy period of time.  (C. Headley Depo., 277:22-278:20, attached as <u>Exhibit "Q"</u> to the Darnell Decl.).  She also believed that if she left and went to her parents to try to get away, her mother would turn her in and her step-father would lose his job.  (C. Headley Depo., 829:5-830:8, attached as <u>Exhibit "T"</u> to the Darnell Decl.).

### (9).   Plaintiff's Escape

In late January 2005, Mrs. Headley determined that she could no longer bear the conditions at Gold Base and escaped.  (C. Headley, 155:20-25, attached hereto as <u>Exhibit "Q"</u> to the Darnell Decl.).

Two Sea Organization members tracked Mrs. Headley to a bus station in Las Vegas, Nevada, shortly after she left.  (C. Headley Depo., 156:1-12, attached as <u>Exhibit "Q"</u> to the Darnell Decl.).  These individuals attempted to get Mrs. Headley to return to Gold Base with them, and one of the individuals threatened that he would

16

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1   follow her to her final destination, that her family would be barred from continuing in

2   Scientology because she was leaving, and that she would never be able to speak with

3   her family again.  (C. Headley Depo., 156:26-157:17, attached as Exhibit "Q" to the

4   Darnell Decl.).  This same individual called Mrs. Headley's husband and told him that

5   she had been intercepted and would not be coming to meet him.  (C. Headley Depo.,

6   515:23-518:9, attached as Exhibit "R" to the Darnell Decl.).  Additionally, he told Mrs.

7   Headley that her coworkers would be in serious trouble as a result of her leaving.  (C.

8   Headley Depo., 515:23-518:9, attached as Exhibit "R" to the Darnell Decl.).

9          When Mrs. Headley escaped Gold Base, she was emaciated and had been

10  sleep deprived for years.  (C. Headley Depo., 594:3-16; 665:4-8, attached as Exhibit

11  "S" to the Darnell Decl.).  Indeed, for several weeks prior to escaping, she was forced

12  to sleep on her office floor in a sleeping bag.  (C. Headley Depo., 594:3-16, attached

13  as Exhibit "S" to the Darnell Decl.).

14

15          **B.    Plaintiff Is A Victim Of Human Trafficking**

16

17          Pursuant to 18 U.S.C. § 1589, "[t]he crime of forced labor occurs when

18  someone knowingly . . . obtains the labor or services of a person: 1) by threats of

19  serious harm to, or physical restraint against, that person or another person; 2) by means

20  of any scheme, plan, or pattern intended to cause the person to believe that, if the

21  person did not perform such labor or services, that person or another person would

22  suffer serious harm or physical restraint; or 3) by means of the abuse or threatened

23  abuse of law or the legal process. . . ."

24          Mrs. Headley is a victim of human trafficking because Defendants

25  knowingly obtained her labor and services by violating each of the provisions set forth

26  in 18 U.S.C. § 1589.  First, Mrs. Headley was threatened with serious harm and

27  physical restraint as set forth above in the detailed factual history.  Second, Defendants

28  clearly engaged in scheme and pattern of conduct to cause Mrs. Headley to believe that

1    if she did not continue working for Defendants, she would suffer serious harm or

2    physical restraint.  This included the significant security measures implemented by

3    Defendants at Gold Base, as well as Defendants' repeated pattern of pursuing Sea

4    Organization members who left, only to bring them back and place them under more

5    restrictions.  Notably, Defendants actually told Mrs. Headley that she had "forgone" her

6    right to leave and that she would be brought back even if she attempted to leave.  (C.

7    Headley Depo., 811:4-13, attached as Exhibit "T" to the Darnell Decl.).  Mrs. Headley

8    was subjected to other means of abuse, such as threats that she would never see her

9    family or husband again, forced abortions, and attempts to force her to divorce her

10    husband.  Indeed, Defendants coerced Mrs. Headley to have an abortion so that she

11    could continue performing labor for them.  (*See* Woodcraft Depo., 74:21-25, 109:18-

12    110:13, attached as Exhibit "M" to the Darnell Decl.).

13

14            **C.**      **The Scripture, Beliefs, and Formal Policies of the Church of**

15                   **Scientology Prohibit Human Trafficking And Forced Labor**

16

17        Defendants expressly prohibit human trafficking and forced labor.  This

18    is reflected in Defendants' By-Laws and other policies, and was confirmed by the

19    corporate designees for both RTC and CSI.  In fact, the public spokesperson for the

20    Church of Scientology testified that "Scientologists, as a general rule, are ***opposed of***

21    ***any human rights violation***:  Anything that violates an individual's right to choose,

22    anything that would reduce a person's freedom, individual[ity], and ability to think for

23    themselves."  (Davis Depo., attached as Exhibit "L" to the Darnell Decl., 104:25-

24    105:14) (emphasis added).

25        Pursuant to the By-Laws and religious policies of RTC, all men have

26    "inalienable rights to their own lives" and "inalienable rights to think freely, to talk

27    freely, to write freely their own opinions and to counter or utter or write upon the

28    opinions of others."  (McShane Depo., 153:17-156:3, attached as Exhibit "G" to the

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    Darnell Decl.).  Moreover, all men (and women) have "inalienable rights to the creation

2    of their own kind." (McShane Depo., 156:4-17, attached as <u>Exhibit "G"</u> to the Darnell

3    Decl.). The By-Laws and religious policies of CSI are identical in those of RTC set

4    forth above.  (Fraser Depo., 242:12-245:20; 246:20-247:1, attached as <u>Exhibit "H"</u> to

5    the Darnell Decl.).

6            The corporate designees for Defendants testified as follows when asked

7    asked about Scientology's religious policies with respect to human trafficking:

8            Q.    Mr. McShane, does the church allow involuntary
         servitude?
9
         A.    No.
10
         Q.    Does the church allow human trafficking?
11
         A.    No, of course not.
12
         Q.    Does the church allow the use of coercion to force
13       labor?

14       A.    No.

15       Q.    Does the church allow harassment?

16       A.    No.

17       Q.    Does the church allow stalking?

18       A.    No.

19       Q.    Does the church allow involuntary confinement?

20       A.    No.

21   (McShane Depo., 100:18-101:6, attached as <u>Exhibit "G"</u> to the Darnell Decl.).

22       Q.  Does the Church of Scientology allow a person to be imprisoned?

23       A.  No.

24       Q.  Does the Church of Scientology allow a person to be held against their
         will?
25
         A.  No.
26
         Q.    Does the Church of Scientology engage in human
27       trafficking?

28       A.  No.

19

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1           Q.  Does the Church of Scientology engage in forced labor, also a form of involuntary servitude?

2

3           A.  No.

4  (Fraser Depo., 168:20-25; 171:18-23, attached as Exhibit "H" to the Darnell Decl.).

5           In fact, consistent with the definition of forced labor set forth in 18 U.S.C.

6  § 1589, the corporate designees of CSI and RTC confirmed that the Church of

7  Scientology officially prohibits physical punishment or detention, physical abuse,

8  battery, assault, aggravated battery, physical isolation, or the use of threats or physical

9  intimidation.  (McShane Depo., 95:24-96:16; 162:22-163:10 attached as Exhibit "G"

10  to the Darnell Decl.; Fraser Depo., 161:6-8; 161:21-162:2; 166:3-11; 172:22-173:2;

11  174:16-176:2; 176:14-18, attached as Exhibit "H" to the Darnell Decl.).  Additionally,

12  the Church of Scientology does not officially physically force, threaten, or otherwise

13  coerce anyone to return to the Sea Organization after they have left, including making

14  threats that a person would never see their family members again.  (McShane Depo.,

15  85:17-87:2, attached as Exhibit "G" to the Darnell Decl.).  The Church of Scientology

16  also does not officially allow food or sleep deprivation.  (McShane Depo., 96:17-96:20,

17  attached as Exhibit "G" to the Darnell Decl.; Fraser Depo., 163:14-16, attached as

18  Exhibit "H" to the Darnell Decl.).  It also religious doctrine that members of the Church

19  of Scientology must abide by the law.  (McShane Depo., 163:11-13, attached as Exhibit

20  "G" to the Darnell Decl.).

21           Additionally, Defendants officially prohibit forced abortions, and make it

22  clear that if a woman is coerced to have an abortion, such is a violation of church

23  policy.  (McShane Depo., 92:9-11; 101:16-102:16; 156:12-21, attached as Exhibit "G"

24  to the Darnell Decl.; Fraser Depo., 160:5-7; 217:10-13, attached as Exhibit "H" to the

25  Darnell Decl.).  The Church of Scientology also officially does not allow a person to

26  be forced or coerced to divorce his or her spouse.  (McShane Depo., 92:11-13, attached

27  as Exhibit "G" to the Darnell Decl.; Fraser Depo., 160:8-10, attached as Exhibit "H"

28  to the Darnell Decl.).

3.     **PURSUANT TO APPLICABLE FEDERAL CASE LAW, THE
MINISTERIAL EXCEPTION DOES NOT APPLY TO HUMAN
TRAFFICKING CLAIMS**

The United States District Court for the Eastern District of New York recently addressed the precise issue of law raised in Defendant's Motion, and held that the ministerial exception does not apply to claims asserted under the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18 U.S.C. §§ 1589, *et seq.* *See Shukla v. Sharma*, No. 07-CV-2972 (CBA), at *1 (E.D.N.Y. Sept. 29, 2009) (adopting Report and Recommendation dated August 21, 2009). The facts and legal issues in this case compel the same finding.

The plaintiff in *Shukla* was a Hindu Priest employed by a not-for-profit religious organization. *Shukla v. Sharma*, No. 07-CV-2972 (CBA), Report and Recommendation, at *2 (E.D.N.Y. August 21, 2009). Given the plaintiff's status as a Hindu Priest, it was not disputed that he was a minister for purposes of the ministerial exception, such that the court focused entirely on whether or not the ministerial exception barred any of the plaintiff's claims. *Id.* at *10. The court ruled that plaintiff could not state claims for minimum wage and overtime under the Fair Labor Standards Act or corresponding state law as these claims clearly fell within the ministerial exception. *Id.* at *10-13. However, the court ruled that the ministerial exception did not apply to human trafficking or forced labor claims because the TVPA "does not require courts to unduly interfere with the internal affairs of religious organizations or get involved in the selection or retention of ministers." *Id.* at *15.

In reaching this conclusion, the court thoroughly addressed the differences between the TVPA and statutes that regulate ordinary, adverse personnel actions to which the ministerial exception does apply:

> [A]s a preliminary matter, the standards that govern what constitutes trafficking and forced labor do not depend on the interpretation of religious doctrine; rather they are secular

21

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

standards that guarantee that employers cannot deprive employees of fundamental human rights. Thus, unlike analyzing suits brought under federal and state employment laws, exploring the ills that the TVPA is meant to combat – namely, trafficking and forced labor – does not require courts to unduly interfere with the internal affairs of religious organizations or get involved in the selection or retention of ministers. Furthermore, a suit under the TVPA is not analogous to a suit under federal and state employment laws, because it is not brought in response to an adverse employment action.

...

Although labor and employment laws seek to eradicate certain societal evils, such as poverty and discrimination, the TVPA seeks to address the evil of human trafficking and *forced* labor, both of which strike directly at the core individual liberty. That is, the TVPA protects infringement upon an individual's liberty from unlawful restraint in an attempt to erradicate modern-day slavery. The type of abuse addressed by the TVPA is **so extreme, offensive, and contrary to fundamental human rights as to distinguish it from the type of conduct that ordinarily gives rise to violations of labor and employment laws**. Given the relative magnitude of the deprivation of individual liberty in cases covered by the TVPA, and the international scope and significance of human trafficking, the TVPA transcends the boundaries of the ministerial exception.

*Id.* at *14-15 (emphasis added).

Other courts similarly have found that the TVPA was adopted to protect fundamental human rights, not to address ordinary employment disputes. In *United States v. Bradley*, 390 F.3d 145, 156-57 (1st Cir. 2004), the court noted that in enacting the TVPA, "Congress thought of forced labor as a species of involuntary servitude," and that the TVPA was "intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion." The court in *United States v. Calimlim*, 538 F. 3d 706, 714 (7th Cir. 2008), also noted that the TVPA was intended to address conditions of "involuntary servitude." Finally, in *United States v. Garcia*, No. 02 CR 110S-01, 2003 WL 22956917, at *4 (W.D.N.Y. Dec. 2, 2003), the court noted that "Section 1589 is intended to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery...."

//

22

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    In fact, when Congress adopted the TVPA, it identified the important state

2  interests underlying this statute, which included the fundamental tenets upon which our

3  society is based:

4    One of the founding documents of the United States, the
   Declaration of Independence, recognizes the inherent dignity

5    and worth of all people. It states that all men are created
   equal and that they are endowed by their Creator with certain

6    unalienable rights. The right to be free from slavery and
   involuntary servitude is among those unalienable rights.

7    Acknowledging this fact, the United States outlawed slavery
   and involuntary servitude in 1865, recognizing them as evil

8    institutions that must be abolished. Current practices of
   sexual slavery and trafficking of women and children are

9    similarly abhorrent to the principles upon which the United
   States was founded.

10
   ...

11
   The United States and the international community agree that

12   trafficking in persons involves grave violations of human
   rights and is a matter of pressing international concern. The

13   international community has repeatedly condemned slavery
   and involuntary servitude, violence against women, and other

14   elements of trafficking...

15  H.R. Conf. Rep. 106-939, §102(b)(22),(23) (October 2000).

16    Given the fundamental rights at issue in Mrs. Headley's human trafficking

17  claim, the Court should follow the *Shukla* court and hold that the ministerial exception

18  does not apply to Mrs. Headley's human trafficking claim asserted under the TVPA.

19

20  **4.**      **THERE CAN BE NO FIRST AMENDMENT FREE EXERCISE**

21         **DEFENSE IN THE ABSENCE OF A CONFLICT BETWEEN**

22         **RELIGIOUS BELIEF AND THE CONDUCT CHALLENGED**

23

24    The primary contention underlying Defendants' Motion is that Mrs.

25  Headley's human trafficking claim impedes Defendants' free exercise of religion in

26  violation of the First Amendment.  To assert this defense, Defendants must establish

27  that Mrs. Headley's human trafficking claim actually infringes on Defendants' free

28  exercise of religion. *See Grove v. Mead School Dist. No. 354*, 753 F.2d 1528, 1533 (9th

23

1   Cir. 1985) (pursuant to Free Exercise Clause, "a litigant must show that challenged state
2   action has a coercive effect that operates against the litigant's practice of his or her
3   *religion*."); *see also Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (to merit
4   protection under the Free Exercise Clause of the First Amendment, a religious claim
5   "must be rooted in religious belief").

6   "In determining whether the proposed application of a statute would
7   violate the Free Exercise Clause, courts must weigh three factors: '(1) the magnitude
8   of the statute's impact upon the exercise of a religious belief, (2) the existence of a
9   compelling state interest justifying the burden imposed upon the exercise of the
10   religious belief, and (3) the extent to which recognition of an exemption from the
11   statute would impede the objectives sought to be advanced by the state." *Bollard*, 196
12   F.3d at 946 (quoting *EEOC v. Pacific Press Publ'g Ass'n*, 676 F.2d 1272, 1279 (9th
13   Cir. 1982)). Notably, the first of these factors requires an assessment of whether or not
14   the statute at issue actually impacts the exercise of one's religious belief.

15   Based on these factors, courts routinely refuse to apply the ministerial
16   exception to the tort claims of ministers where there is no religious justification for the
17   conduct challenged by a minister. For instance, in *Bollard*, the court refused to apply
18   the ministerial exception to the plaintiff's claim for sexual harassment because the
19   Jesuit order "did not offer a religious justification" for the alleged harassment, and
20   even "condemned it as inconsistent with their values and beliefs." *Bollard*, 196 F.3d
21   at 947. As a result, the court ruled that the plaintiff's sexual harassment claim did "not
22   run afoul of the Free Exercise Clause" because there was little danger that application
23   of Title VII would interfere with the religious faith or doctrine of the Jesuit order given
24   its disavowment of sexual harassment. *Id.*

25   The court in *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th
26   Cir. 2004), similarly found that an alleged minister could assert a Title VII sexual
27   harassment claim against her religious employer because there was no religious
28   justification for the conduct challenged. In reaching this decision, the court explained:

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1  Elvig may, consistent with the First Amendment, attempt to
   show that she was sexually harassed and that this harassment
2  created a hostile work environment.  *Bollard*, 196 F.3d at
   949-50.   This showing would, after all, involve a purely
3  secular inquiry. Assuming Elvig can prove a hostile work
   environment, the Church may nonetheless invoke First
4  Amendment protection from Title VII liability if it claims
   that her subjection to or the Church's toleration of sexual
5  harassment was doctrinal. We do not scrutinize doctrinal
   justifications because "[i]t is ... not our role to determine
6  whether the Church had a secular or religious reason for the
   alleged mistreatment of [Elvig]." *Alicea-Hernandez v.*
7  *Catholic Bishop of Chi.*, 320 F.3d 698, 703 (7th Cir.2003).
   As in *Bollard*, however, the Defendants here "do not offer a
8  religious justification for the harassment [Elvig] alleges,"
   *Bollard*, 196 F.3d at 947, and, indeed, deny it occurred at all.

9

10  Likewise, in *Petruska v. Gannon University*, 448 F.3d 615, 620 (3rd Cir. 2006), a

11  minister was allowed to assert a Title VII discrimination claim against his religious

12  employer because his claim did not infringe on the defendant's free exercise of religion:

13  ...where a church discriminates for reasons unrelated to
    religion, we hold that the Constitution does not foreclose
14  Title VII suits. Employment discrimination unconnected to
    religious belief, religious doctrine, or the internal regulations
15  of a church is simply the exercise of intolerance, not the free
    exercise of religion that the Constitution protects.

16

17  Clearly, in order for Defendants to assert a First Amendment defense based

18  on the Free Exercise Clause, Defendants must establish that Mrs. Headley's human

19  trafficking claim actually infringes on Defendants' free exercise of religion.   As

20  addressed below, there is no conflict in this case between the Scientology religion and

21  Mrs. Headley's human trafficking claim because Defendants have no religious

22  justification for human trafficking and even contends that they do not engage in human

23  trafficking.

24  //

25  //

26  //

27  //

28  //

25

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

1   **5.        NO CONFLICT EXISTS BETWEEN THE SCIENTOLOGY**
2   **RELIGION AND THE LAW OF HUMAN TRAFFICKING**
3   **BECAUSE THE CHURCH OF SCIENTOLOGY PROHIBITS**
4   **HUMAN TRAFFICKING**

5

6           Defendants' free exercise defense under the First Amendment to Mrs.
7   Headley's human trafficking claim fails because Defendants deny that the Church of
8   Scientology allows or engages in human trafficking, involuntary servitude, or forced
9   labor.  The deposition testimony of the corporate designees of both CSI and RTC make
10  this denial clear:

11          Q.    Mr. McShane, does the church allow involuntary
             servitude?
12
             A.    No.
13
             Q.    Does the church allow human trafficking?
14
             A.    No, of course not.
15
             Q.    Does the church allow the use of coercion to force
16           labor?

17           A.    No.

18           Q.    Does the church allow harassment?

19           A.    No.

20           Q.    Does the church allow stalking?

21           A.    No.

22           Q.    Does the church allow involuntary confinement?

23           A.    No.

24  (McShane Depo., 100:18-101:6, attached as <u>Exhibit "G"</u> to the Darnell Decl.).

25           Q.  Does the Church of Scientology allow a person to be imprisoned?

26           A.  No.

27           Q.  Does the Church of Scientology allow a person to be held against their
             will?
28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    A.  No.

2     Q.   Does the Church of Scientology engage in human trafficking?

3    A.  No.

4    Q.  Does the Church of Scientology engage in forced labor, also a form of involuntary servitude?

5

6    A.  No.

7  (Fraser, 168:20-25; 171:18-23).

8           Indeed, consistent with the definition of forced labor set forth in 18 U.S.C.

9  § 1589, the corporate designees of CSI and RTC confirmed that the Church of

10 Scientology officially prohibits physical punishment or detention, physical abuse,

11 battery, assault, aggravated battery, physical isolation, or the use of threats or physical

12 intimidation. (McShane Depo., 95:24-96:16; 162:22-163:10, attached as Exhibit "G"

13 to the Darnell Decl.; Fraser Depo., 161:6-8; 161:21-162:2; 166:3-11; 172:22-173:2;

14 174:16-176:2; 176:14-18, attached as Exhibit "H" to the Darnell Decl.).  Additionally,

15 the Church of Scientology officially does not physically force, threaten, or otherwise

16 coerce anyone to return to the Sea Organization after they have left, including making

17 threats that a person would never see their family members again.  (McShane Depo.,

18 85:17-87:2, attached as Exhibit "G" to the Darnell Decl.).  The Church of Scientology

19 officially also does not allow food or sleep deprivation.  (McShane Depo., 96:17-96:20,

20 attached as Exhibit "G" to the Darnell Decl.; Fraser Depo., 163:14-16, attached as

21 Exhibit "H" to the Darnell Decl.).  Moreover, the public spokesperson for the Church

22 of Scientology confirmed under oath that "Scientologists, as a general rule, are **opposed**

23 **of any human rights violation**:  Anything that violates an individual's right to choose,

24 anything that would reduce a person's freedom, individual[ity], and ability to think for

25 themselves."  (Davis Depo., 104:25-105:14) (emphasis added).  It also religious

26 doctrine that members of the Church of Scientology must abide by the law.  (McShane

27 Depo., 163:11-13, attached as Exhibit "G" to the Darnell Decl.).

28 //

27

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

1    Given Defendants' very clear beliefs and position against human

2    trafficking and forced labor, Defendants have no grounds on which to claim that Mrs.

3    Headley's human trafficking claim violates Defendants' free exercise of religion.

4    Defendants are in the same position as the religious organizations in *Bollard*, *Elvig*, and

5    *Petruska*, who could not offer a religious justification for the conduct challenged, and

6    as such, could not properly assert a defense based on the Free Exercise Clause of the

7    First Amendment.  As there is no conflict between the Scientology religion and the

8    conduct that the TVPA was established to regulate, the Court should reject Defendants'

9    assertion that Mrs. Headley's human trafficking claim violates the Free Exercise Clause

10   of the First Amendment.

11

12   **6.      DEFENDANTS' ARGUMENT THAT ALLOWING PLAINTIFF'S**

13   **HUMAN TRAFFICKING CLAIM WOULD VIOLATE THE**

14   **ESTABLISHMENT CLAUSE FAILS, BECAUSE THERE CAN BE**

15   **NO ENTANGLEMENT OF RELIGION AND GOVERNMENT**

16   **WHERE THE CHURCH PROHIBITS HUMAN TRAFFICKING**

17

18   Defendants further contend that the Court should apply the ministerial

19   exception to Mrs. Headley's human trafficking claim because allowing Mrs. Headley

20   to proceed with this claim would cause the Court to become excessively entangled in

21   the Scientology religion in violation of the Establishment Clause of the First

22   Amendment.  The Court should reject this argument as nothing about Mrs. Headley's

23   human trafficking claim could possibly entangle the Court in the Scientology religion

24   or that could place Defendants' rights under the Establishment Clause at risk.

25   The Establishment Clause of the First Amendment states that "Congress

26   shall make no law respecting an establishment of religion."  "[T]he three main evils

27   against which the Establishment Clause was intended to afford protection [are]

28   'sponsorship, financial support, and active involvement of the sovereign in religious

1    activity.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (quoting *Walz v. Tax*

2    *Comm'n*, 397 U.S. 664, 668 (1970). A three-part test is utilized to determine if a statute

3    violates the Establishment Clause: "First, the statute must have a secular legislative

4    purpose; second, its principal or primary effect must be one that neither advances nor

5    inhibits religion; finally, the statute must not foster 'an excessive government

6    entanglement with religion.'" *Lemon*, 403 U.S. at 612-13 (internal citations omitted).

7          It is undisputed in this case that the TVPA has a secular legislative purpose

8    and that the principal effect of this statute is neither to advance nor inhibit religion.

9    Defendants contend, however, that application of the TVPA in this case would foster

10   excessive entanglement of this Court in the Scientology religion.

11         The short and simple answer to Defendants' argument is that there can be

12   no entanglement of church and state where the state enforces laws that do not conflict

13   with a church's religious beliefs. Since Defendants prohibit and officially do not

14   tolerate human trafficking, allowing Mrs. Headley's human trafficking claim to proceed

15   cannot entangle this Court in the religious beliefs, doctrine, or practices of the Church

16   of Scientology. *Bollard*, 196 F.3 at 947-48.

17

18   **7.**       **ASSUMING, ARGUENDO, THAT DEFENDANTS SOMEHOW**

19               **COULD ASSERT A FIRST AMENDMENT DEFENSE, THE**

20               **DEFENSE FAILS BECAUSE THE FIRST AMENDMENT ONLY**

21               **PROTECTS RELIGIOUS BELIEFS, NOT UNLAWFUL CONDUCT**

22

23          While "the first amendment absolutely protects the holding of any religious

24   belief, no matter how bizarre or irrational, . . . the 'operational activities' of a religion,

25   those activities that are not solely in the ideological or intellectual realm, are subject to

26   judicial review and may be regulated to achieve a sufficiently important state

27   objective." *Turner v. Unification Church,* 473 F.Supp. 367, 371-72 (D. R.I. 1978).

28   Thus, while statutes may not dictate religious *beliefs*, statutes may prohibit unlawful

29

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    *conduct* without violating the First Amendment.

2              "The Supreme Court has recognized that the first amendment's protection

3    of religious liberty 'embraces two concepts – freedom to believe and freedom to act.

4    The first is absolute but, in the nature of things, the second cannot be.  Conduct remains

5    subject to regulation for the protection of society. . . . Thus, religious operations that

6    endanger public safety, threaten disorder, endanger the health of a member, or

7    drastically differ from societal norms may be regulated or prohibited."  *Turner v.*

8    *Unification Church* (D. R.I. 1978) 473 F.Supp. 367, 372.  In essence, "churches are not

9    – and should not be – above the law" and [l]ike any other person or organization, they

10   may be held liable for their torts. . . ."  *Rayburn v. Gen. Conf. Of Seventh-Day*

11   *Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)).

12             In *Turner*, the plaintiff alleged that after she joined the defendants' church,

13   she was placed in involuntary servitude, where she was "forced to work long hours

14   'often more than 12 hours per day' of 'compulsory service' soliciting money and selling

15   such items as candies, flowers and tickets for Unification Church rallies." *Turner*, 473

16   F.Supp. at 370-71.  The defendants asserted that the free exercise clause prohibited the

17   court from hearing the suit.  *Id.*  The court rejected this assertion, holding that

18   defendants were not immune from causes of action alleging involuntary servitude or

19   other intentional tortious activity based on the free exercise clause of the First

20   Amendment.  In reaching this conclusion, the court stated:

21             The alleged involuntary servitude is unquestionably an act
             which has a serious adverse effect upon one of the Church's
22            followers and constitutes conduct that violates the most
             fundamental tenets of both American society and the United
23            States Constitution.  The Unification Church cannot seek the
             protection of one constitutional amendment while it allegedly
24            deprives citizens the protection of other constitutional
             guarantees.

25

26   *Id.* at 372.

27             Thus, the free exercise clause is no defense to a claim alleging involuntary

28   servitude, i.e., human trafficking.  *See also, Sherbert v. Verner*, 374 U.S. 398, 402-03

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1     (1963) (It is fundamental to our system that each person has a right to believe as he

2     wishes and to practice that belief according to the dictates of his conscience, *so long as*

3     he does not violate the personal rights of others).  Given the fundamental rights at issue

4     in this lawsuit, which are similar to those addressed in *Turner*, Defendants' conduct is

5     subject to regulation and Defendants are not above the law.

6

7     **8.**        **DEFENDANTS' ATTEMPTS TO CHARACTERIZE THE TVPA AS**

8             **AN ORDINARY EMPLOYMENT STATUTE FAIL**

9

10     The Court should reject Defendants' attempt to characterize the TVPA as

11     an ordinary employment statute.  Defendants contend that because **one** of the damages

12     available under the TVPA is "the value of the victim's labor as guaranteed under the

13     minimum wage and overtime" provisions of the Fair Labor Standards Act, the

14     ministerial exception clearly bars any claim pursued under the TVPA.  This argument

15     not only ignores the many, distinct damages available under the TVPA, but also ignores

16     the fundamental human rights that the TVPA was established to protect as discussed

17     in detail above.  Under 18 U.S.C. § 1593(b)(3), a victim of human trafficking is entitled

18     to recover not only minimum wage and overtime, but also the "full amount of the

19     victim's losses" as set forth in 18 U.S.C. § 2259(b)(3).  Under 18 U.S.C. § 2259(b)(3)

20     a victim of human trafficking or forced labor is entitled to the following:

21             [A]ny costs incurred by the victim for--

22

23             (A) medical services relating to physical, psychiatric, or psychological care;

24             (B) physical and occupational therapy or rehabilitation;

25             (C) necessary transportation, temporary housing, and child care expenses;

26

27             (D) lost income;

            (E) attorneys' fees, as well as other costs incurred; and

28

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

1    (F) ***any other losses suffered by the victim as a proximate
result of the offense***.

2

3    Minimum wage and overtime pay is only a minor part of the ***damages*** available under

4    the TVPA, such that Defendants cannot properly classify the TVPA as a "back door"

5    to imposing the Fair Labors Standards Act. Indeed, in determining if a violation of the

6    TVPA occurred, the Court is not required to assess or determine whether minimum

7    wage or overtime was paid to the victim as that damage is entirely separate from the

8    crime of forced labor itself.

9        Under 18 U.S.C. § 1589, "[t]he crime of forced labor occurs when

10   someone knowingly . . . obtains the labor or services of a person: 1) by threats of

11   serious harm to, or physical restraint against, that person or another person; 2) by means

12   of any scheme, plan, or pattern intended to cause the person to believe that, if the

13   person did not perform such labor or services, that person or another person would

14   suffer serious harm or physical restraint; or 3) by means of the abuse or threatened

15   abuse of law or the legal process. . . ."

16       Nothing in this statute suggests that a finding of forced labor is contingent

17   on the failure to pay minimum wage or overtime or any other violation of the Fair Labor

18   Standards Act. Rather, as noted by the *Shukla* court, the TVPA very clearly "seeks to

19   address the evil of human trafficking and *forced* labor, both of which strike directly at

20   the core individual liberty." *Shukla*, No. 07-CV-2972 (CBA), Report and

21   Recommendation, at *14 (emphasis in original). As such, the Court should reject

22   Defendants' misrepresentations regarding the TVPA, including Defendants'

23   misrepresentations regarding the applicability of the ministerial exception to Mrs.

24   Headley's claim under the TVPA.

25   //

26   //

27   //

28   //

32

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

**9.**       **THE LIMITATIONS DEFENDANT SEEKS TO IMPOSE ON PLAINTIFF'S HUMAN TRAFFICKING CLAIM ARE IMPROPER AND UNDERMINE THE ENTIRE INTENT OF THE TVPA**

Defendants contend that pursuant to the Religious Freedom Restoration Act ("RFRA"), this Court should limit any consideration of Mrs. Headley's human trafficking claim to only instances of actual or threatened physical restraint and nothing further. Such a limitation would completely undermine the entire intent of 18 U.S.C. § 1859 and the important government interests underlying this statute - i.e., protection against modern-day forms of slavery.

Congress made clear that 18 U.S.C. § 1589 was intended to address not only physical harm and captivity, but more importantly, psychological methods of coercion: "Adopted in 2000 as part of a broader set of provisions – the Victims of Trafficking and Violence Protection Act of 2000, 114 Stat. 1464 – section 1589 was intended expressly to counter *United States v. Kozminski*, 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988)." *United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) (citing H.R. Conf. Rep. No. 106-939, at 100-01 (2000)). "In *Kozminski*, the Supreme Court had interpreted the pre-existing ban on 'involuntary servitude' in section 1584 to prohibit only conduct involving the use or threatened use of physical or legal coercion." *Bradley*, 390 F.3d at 150 (citing *Kozminski*, 487 U.S. at 949-52). "In glossing the new statute, the conference report said 'serious harm' was intended to encompass not only physical violence, but also more subtle psychological methods of coercion—'such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence.' *See* H.R. Conf. Rep. No. 106-939, at 101. It continued: 'The term `serious harm' as used in this Act refers to a broad array of harms, including both physical and nonphysical....' Id." *Bradley*, 390 F.3d 150; *see also U.S. v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("Section 1589 is not written in terms

33

1   limited to overt physical coercion, and we know that when Congress amended the

2   statute it expanded the definition of involuntary servitude to include nonphysical forms

3   of coercion.").

4          Ultimately, the TVPA, and specifically 18 U.S.C. § 1589 will lose all of

5   their purpose and effect if the Court construes them as narrowly as Defendants request.

6   Pursuant to RFRA, 18 U.S.C. § 1589, as defined under the statute, is the least restrictive

7   means by which the Court and government can achieve the important goals of

8   protecting individual liberty and eradicating modern-day forms of involuntary

9   servitude.

10

11   **10.**         **<u>CONCLUSION</u>**

12

13          For each of the foregoing reasons, Defendants' Joint Motion for Summary

14   Judgment should be denied in its entirety.

15

16   DATED: July 12, 2010        METZGER LAW GROUP
                          A Professional Law Corporation

17

18                            /s/

19

20                      RAPHAEL METZGER, ESQ.
                   Attorneys for Plaintiff
                   CLAIRE HEADLEY

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and am not a party to the within action.  My business address is 401 East Ocean Blvd., #800, Long Beach, CA 90802.

On July 12, 2010, I served the foregoing document, described as: **PLAINTIFF CLAIRE HEADLEY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT** on the parties to this action as follows:

  **X  (ELECTRONIC FILING/SERVICE)** Complying with United States District Court General Order re Electronic Filing, my electronic business address is nvidal@toxictorts.com and I caused such document(s) to be electronically served through CM/ECF of the Central District of California, United States District Court website at www.cacd.uscourts.com addressed to all parties appearing on the electronic service list for the above-entitled case.  The file transmission was reported as complete and a copy of the Filing/Service Receipt will be maintained with the original document(s) in our offices.

I declare that I am employed in the offices of a member of this court, at whose direction service was made.

Executed on July 12, 2010, at Long Beach, California.

s/
_____
Nina S. Vidal, Declarant

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

F:\WP\Cases\9526\SUM-JUDG\Claire - Second Motion\Opposition - Memorandum.wpd

# PROOF OF SERVICE

1

Marc Headley vs. Church of Scientology, Case No. CV09-3986 DSF (MANx)

2

and

Claire Headley vs. Church of Scientology, Case No. CV09-3987 DSF (MANx)

3

-o0o-

4

Barry Van Sickle, Esq.

5   1079 Sunrise Avenue, Suite B-315
Roseville, ca 95661

6   (Plaintiff)

7   Anthony J. Oncidi, Esq.
Harold M. Brody, Esq.

8   G. Samuel Cleaver, Esq.
Bert H. Deixler, Esq.

9   Proskauer Rose
2049 Century Park East, Suite 3200

10  Los Angeles, CA 90067-3206
(Church of Scientology International)

11

Kendrick L. Moxon, Esq.

12  Moxon & Kobrin
3055 Wilshire Blvd., Suite 900

13  Los Angeles, CA 90010
(Church of Scientology International)

14

Eric M. Lieberman, Esq.

15  Rabinowitz, Boudin, Standard, Krinsky & Lieberman

16  111 Broadway, 11th Floor
New York, NY 10006

17  (Church of Scientology International)

18  Marc Marmaro, Esq.
Amy Lerner Hill, Esq.

19  Matthew D. Hinks, Esq.
Jeffer, Mangels, Butler & Marmaro

20  1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-4308

21  (Religious Technology Center)

22

23

24  (Updated June 8, 2010 kk)

25

26

27

28

36