UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

| Case No. | CV 09-3987 DSF (MANx) | Date | 8/5/10 |
|---|---|---|---|
| Title | Claire Headley v. Church of Scientology International, et al. | | |

| Present: The Honorable | DALE S. FISCHER, United States District Judge | |
|---|---|---|
| Debra Plato | | Not Present |
| Deputy Clerk | | Court Reporter |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:** (In Chambers) Order GRANTING Defendants' Motion for Summary Judgment (Docket No. 158)

## I. FACTUAL BACKGROUND[1]

    Plaintiff was raised in the Church of Scientology, and in 1991 she joined the religious order called the Sea Organization, or the Sea Org. (Defs.' Reply Statement of Uncontroverted Facts ("Defs.' SOUF") ¶¶ 1, 9, 13.) Defendants' staff all belong to the Sea Org, and the senior leadership of Scientology is drawn exclusively from this organization. (Id. at ¶¶ 4-5.)

    Sea Org members live communally, must devote two and a half hours a day to religious study, wear uniforms when on duty, "and have a merit-based maritime rank and rating system and etiquette." (Id. at ¶ 3.) Before persons join the Sea Org, they are told that they will work long and hard hours without material compensation, and that they may be assigned anywhere in the world if it would help further the goals and expansion of Scientology. (Id. at ¶ 7.) Since 1986 Sea Org members have not been allowed to raise children, because the church concluded that the responsibilities of caring for and raising children conflicted with the rigorous and single-minded lifestyle. (Id. at ¶¶ 166-67.) Defendants contend members who wish to raise children can leave the Sea Org and work

---

[1] Unless otherwise noted, the Court relies only on undisputed facts, facts as to which the Court finds the "dispute" to be invalid, and facts as to which the Court denies any evidentiary objections. As with the prior motion for summary judgment, most of Plaintiff's "disputes" are actually objections in disguise, lack merit, and do not create genuine issues of fact.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

in a local Scientology church. (Id.) Plaintiff submits testimony that if a member becomes pregnant, Defendants attempt to persuade that member not to raise the child, and discuss with the member the option of having an abortion. (Darnell Decl. Ex. M at 74:21-25, 109:18-110:13.)

Discipline within the Sea Org is based on the church's scripture. (Defs.' SOUF ¶ 155.) When Sea Org members act contrary to Scientology's ethical standards, they may be disciplined with either a verbal reprimand, temporary loss of privileges, removal from their position, manual labor, or expulsion from the group. (Id. at ¶ 157; Pl.'s Undisputed Facts ("Pl.'s UF") ¶ 5.) Sea Org members often are not allowed to leave Defendants' premises without an escort, and Defendants conduct a procedure known as a "muster" to identify the whereabouts of their staff. (Pl.'s UF ¶¶ 19-20.)

If Sea Org members want to leave the organization, they may complete a process called "routing out." (Defs.' SOUF ¶ 163.) During this process they are still expected to contribute to the Sea Org, and may be required to perform manual labor. (Id. at ¶ 164.) If a Sea Org member leaves the organization without routing out, members will attempt to follow that member and try to persuade him not to leave the Sea Org. (Defs.' SOUF ¶ 165.) If he decides not to return, he is labeled a "suppressive person," which is the functional equivalent of excommunication. (Id.) Plaintiff testified that Defendants' "policy and procedure" is to discipline members who even mention wanting to leave. (Darnell Decl. Ex. R at 541:5-19.)

Prior to joining the Sea Org, Plaintiff had to undertake extensive training and study, pass a fitness examination, and receive certification that she was qualified for the rigors of the Sea Org life. (Defs.' SOUF ¶ 2.) She understood what the Sea Org lifestyle entailed because her mother, uncle, and cousins had all been Sea Org members. (Id. at ¶ 10.) She decided to join the Sea Org because she believed it was the "correct thing to do" and that those not in the Sea Org were disreputable. (Id. at ¶ 15.) She continued to believe in Scientology until she left her position with Defendants in January 2005. (Id. at ¶ 113.)

From 1991 until January 2005, Plaintiff worked in a variety of positions for Defendants.[2] (Id. at ¶ 13.) She left after she "became embroiled in an ecclesiastical

---

[2] Plaintiff contends that she was "forced to perform labor for Defendant[s] against her will as a result of physical, social, and psychological pressures imposed on [her] by Defendant[s]." (Pl.'s UF ¶ 37.) She supports this contention solely with the declaration of Robert Levine, a psychology professor at California State University, Fresno. (Id.) The Court sustains Defendants' objection to this declaration under Rule 702 of the Federal Rules of Evidence. Rule 702 allows expert opinion evidence if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Because the only

## MEMORANDUM

dispute" when Defendant Religious Technology Center ("RTC") ordered its staff members to remain unmarried or be married only to a fellow staff member. (Id. at ¶ 123.) Plaintiff was "distraught" about this predicament and pleaded with RTC to allow her to remain a staff member even though her husband was not an RTC staff member. (Id. at ¶ 125.) Plaintiff ultimately left the Sea Org in January 2005. (Id. at ¶ 134.)

In 1994, Plaintiff became pregnant and had an abortion. (Id. at ¶¶ 172, 174.) Before having the abortion, Plaintiff discussed with her husband that abortion was her only option because if she chose not to have the abortion they "would both get in a lot of trouble," she would be interrogated, and she would be assigned heavy manual labor; in addition, children were not allowed on the property. (Darnell Decl. Ex. S at 734:20-740:21, 760:15-767:3.) Plaintiff also testified that she believed she was having this abortion against her will. (Id. at 765:16-18.)

In 1996, Plaintiff became pregnant again, and had another abortion. (Defs.' SOUF ¶ 175.) Plaintiff testified that when one of Defendants' staff discovered the pregnancy, Plaintiff was asked if she had gotten pregnant as a means of "escape" (though Plaintiff does not remember if the staff member used that word). The staff member told Plaintiff she needed to deal with the issue or there would be consequences. (Darnell Decl. Ex. S at 771:22-778:4.) Plaintiff testified that she had the second abortion for many of the same reasons as the first, and that this abortion was against her will as well. (Id.)

Throughout her time with the Sea Org Plaintiff had thought "on and off" about leaving, but had always decided to stay because "[e]scape was not an easy thing to do, particularly with no resources or contacts, financial or otherwise, in the outside world, and no easy means of escape without being tracked down." (Id. at 762:21-763:3.) She testified that a co-worker "shoved" her because he "was pissed off about some production matter," and one of RTC's executives required her to drag him across a room to demonstrate that she and several others were his "ball and chain." (Darnell Decl. Ex. Q at 183:25-185:17.) She also contends that the executive assaulted staff members in her presence at least fifty times. (Claire Headley's Decl. in Support of Pl.'s Opp'n ¶ 8.) Plaintiff alleges that while she was a Sea Org member, she was subject to discipline whereby her mess hall privileges were revoked, she had to sleep at her work station, and she was assigned heavy manual labor, such as moving heavy boxes or grounds work.

---

materials Professor Levine reviewed before forming his "expert opinion" were deposition transcripts from Marc and Claire Headley, the Court finds that the opinion is not the product of reliable principles and methods. Plaintiff has not provided any evidence showing that others in Professor Levine's field use a similar methodology when forming their expert opinion – that is, that they base their "expert opinion" solely on the deposition transcripts of the parties who hired them. For these and the other reasons stated in the objections, the declaration is stricken in its entirety.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

(Pl.'s UF ¶ 8; Darnell Decl. Ex. Q at 138:4-12; Darnell Decl. Ex. S at 594:3-16, 665:4-8; Darnell Decl. Ex. T at 881:13-882:23.)  She also contends that it was a "very common occurrence" for Defendants to censor her communications.  (Pl.'s UF ¶ 10.)

Plaintiff left the organization in January 2005 after an escort took her to an optometrist appointment.  (Defs.' SOUF ¶ 134.)  Plaintiff testified that this escort was provided to ensure that she would not escape from Defendants, but she was able to do so after the escort dropped her off and went to find a parking spot.  (Darnell Decl. Ex. S at 577:23-579:18.)  Plaintiff testified that after she escaped, two Sea Org members tracked her down at a bus station in Las Vegas, Nevada, and tried to make her return by: (1) threatening that they would continue to follow her after she left Las Vegas; (2) threatening her family's ability to continue in Scientology; (3) threatening that she would not be able to speak to her family anymore; and (4) claiming that her co-workers would be in trouble if she did not return.  (Darnell Decl. Ex. Q at 156:1-157:17; Darnell Decl. Ex. R at 515:23-518:9.)

## II.  LEGAL STANDARD

Summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The moving party need not disprove the opposing party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial.  Id. at 323-24; Fed. R. Civ. P. 56(e).  A non-moving party who bears the burden of proof at trial as to an element essential to her case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment.  See Celotex Corp., 477 U.S. at 322.

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there be no *genuine* issue of *material* fact."  Anderson, 477 U.S. at 247-48.  "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment.  See Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury . . . could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict . . . ."  Anderson, 477 U.S. at 252.  "Only disputes over facts that might affect the outcome of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.

### III. DISCUSSION

**A. The Ministerial Exception Applies to Plaintiff's Trafficking Victims Protection Act Claim**

The Trafficking Victims Protection Act ("TVPA") prohibits, inter alia, knowingly obtaining the labor or services of a person by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person. 18 U.S.C. § 1589(a)(1). A victim of a violation of the TVPA may bring a civil action against the perpetrator. 18 U.S.C. § 1595.

Defendants argue that this claim fails because of the First Amendment's ministerial exception. The Court agrees. "The Religion Clauses of the First Amendment provide that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" Alcazar v. Corp. of the Catholic Archbishop of Seattle, 598 F.3d 668, 671 (9th Cir. 2010) (quoting U.S. Const. Amend. I).

In determining whether a statute implicates the Free Exercise Clause of the First Amendment, courts must balance:

> (1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

Id. at 672 (internal quotation marks omitted). "[E]ven in pursuit of a compelling state interest, the balancing test contemplates that some statutes may still have such an adverse impact on religious liberty as to render judicial review of a Church's compliance with the statute a violation of the Free Exercise Clause." Id. (internal quotation marks omitted). The "rationale for protecting a church's personnel decisions concerning its ministers is the necessity of allowing the church to choose its representatives using whatever criteria it deems relevant." Id. at 674 (internal quotation marks omitted). Even so, "[w]here the church provides no doctrinal nor protected-choice based rationale for its alleged actions, and indeed expressly disapproves of the alleged actions," then the rational for applying the exception under this clause most likely does not exist. Bollard v. California Province of the Society of Jesus, 196 F.3d 940, 948 (9th Cir. 1999).

In determining whether a statute implicates the Establishment Clause, courts must assess: "(1) whether the statute has a secular legislative purpose, (2) whether its principal or primary effect advances or inhibits religion, and (3) whether it fosters an excessive

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

government entanglement with religion." Alcazar 598 F.3d at 672 (internal quotation marks, ellipsis, and brackets omitted).

Entanglement issues arise whenever the Court must "evaluate religious doctrine or the 'reasonableness' of the religious practices followed by the church." Bollard, 196 F.3d at 950. "Entanglement has substantive and procedural components." Alcazar, 598 F.3d at 672. "On a substantive level, applying a statute to the clergy-church employment relationship creates a constitutionally impermissible entanglement with religion if the church's freedom to choose its ministers is at stake." Id. (internal quotation marks and brackets omitted). "As for the procedural dimension, the very process of civil court inquiry into the clergy-church relationship can be sufficient entanglement." Id. at 672-73. In other words, "[i]t is not only the conclusions that may be reached by the court which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." Id. at 673 (internal quotation marks and brackets omitted).

The Ninth Circuit has interpreted these clauses to "compel a ministerial exception from neutral statutory regimes that interfere with the church-clergy employment relationship."[3] Alcazar, 598 F.3d at 673. This exception exists because "government interference with the church-minister relationship *inherently* burdens religion." Id. It provides protection from statutory liability if a church claims that the challenged conduct is doctrinal; courts "do not scrutinize doctrinal justifications because it is not [their] role to determine whether the Church had a secular or religious reason for the alleged mistreatment . . . ." Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 959 (9th Cir. 2004) (internal quotation marks omitted). This means that "[a] church's selection of its ministers is unfettered, and its true reasons – whatever they may be – are . . . unassailable." Id. at 961.

"Because the ministerial exception is constitutionally compelled, it applies as a matter of law across statutes, both state and federal, that would interfere with the church-minister relationship." Alcazar, 598 F.3d at 673. The exception "encompasses all tangible employment actions and disallows lawsuits for damages based on lost or reduced pay." Id. at 674 (internal quotation marks omitted). "A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Elvig, 375 F.3d at 960-61 (internal quotation marks omitted). Moreover, "a minister's working conditions . . . are a part of the minister's

---

[3] "The Supreme Court has not explicitly addressed the ministerial exception, but the Court's . . . decisions recognize that the First Amendment strongly circumscribes legislative and judicial intrusion into the internal affairs of a religious organization." Alcazar, 598 F.3d at 673.

**MEMORANDUM**

employment relationship with the church." <u>Werft v. Desert Southwest Annual Conference of the United Methodist Church</u>, 377 F.3d 1099, 1103 (9th Cir. 2004).

The Court has already determined as a matter of law that Defendants are religious institutions and that Plaintiff served as a minister for them. (Docket No. 100.) Therefore, Plaintiff's TVPA claim cannot be grounded on conduct shielded from judicial scrutiny by the ministerial exception.

Plaintiff does not dispute that prior to joining the Sea Org she was aware of the challenges such membership would entail. She also has not put forward any admissible evidence that she joined the Sea Org against her will. Even so, she argues that she is a victim under the TVPA because: (1) Defendants coerced her into having two abortions; (2) Defendants placed restrictions on Sea Org members' ability to leave; (3) Defendants pursue Sea Org members who leave without routing out and attempt to dissuade them from their decision; (4) Defendants discipline Sea Org members who even express a desire to leave; (5) Defendants censor Sea Org members' communications; (6) Defendants' discipline of Sea Org members includes sleep and eating deprivation and heavy manual labor; and (7) Defendants attempted to force Plaintiff to divorce her husband. (Pl.'s Opp'n 17-18.)[4]

In contrast to <u>Bollard</u> and <u>Elvig</u>, Defendants here represent that the challenged conduct was doctrinally motivated. (<u>E.g.</u>, Defs.' Reply 10-11, 15-18.) Therefore, inquiry into these allegations would entangle the Court in the religious doctrine of Scientology and the doctrinally-motivated practices of the Sea Org. It would also require the Court to analyze the criteria Defendants use to choose their ministers and the reasonableness of the methods used to enforce church policy and encourage members to remain with the organization and the religion itself. For example, inquiry concerning the pressure Plaintiff allegedly faced after becoming pregnant would require review of Scientology's doctrine prohibiting Sea Org members from raising children. In order to determine whether Defendants' means of persuading members to remain with the Sea Org, etc. fall within the purview of the TVPA, a trier of fact must inquire into Scientology's policies, practices, and scriptures.

The Court rejects Plaintiff's argument that the challenged conduct was not doctrinally motivated. The argument is premised on the deposition testimony of Defendants' representatives that Scientology does not allow involuntary servitude, forced

---

[4] It is not clear what significance, if any, Plaintiff attributes to a shove in the mid-90's. (<u>See</u> Pl.'s Opp'n 17-18, which does not mention this conduct.) Though Defendants do not argue that physical abuse, if it occurs, is doctrinally motivated, Plaintiff provides no basis for holding Defendants responsible for this specific conduct by a "co-worker." In any event, this single incident in her 14 year tenure is the merest "scintilla of evidence" and would not be sufficient for a jury to find that a violation of the TVPA had occurred. <u>See</u> <u>Anderson</u>, 477 U.S. at 252.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

labor, or human trafficking. (Pl.'s Opp'n 26-28.) But the argument is circular. The questions did not address the actual conduct alleged by Plaintiff. (See id.; see also Defs.' Reply 29-30.) Determining whether Scientology's practices of routing out, censorship, or heavy manual labor as a form of discipline, for example, constitute involuntary servitude within the meaning of the TVPA is precisely the type of entanglement that the Religion Clauses prohibit.

The Court also rejects Plaintiff's argument that the ministerial exception categorically does not apply to claims under the TVPA. The only support for this argument comes from an out-of-circuit magistrate judge's report and recommendation that does not even cite to Ninth Circuit decisions on the ministerial exception, let alone apply the exception in accordance with Ninth Circuit case law. Moreover, the report's categorical exclusion of the TVPA from the ministerial exception appears contrary to the Ninth Circuit's articulation of the exception.

For these reasons, this claim fails.

## B.  Plaintiff Lacks Standing to Pursue Her § 17200 Claim

Plaintiff does not contest Defendants' argument that she lacks standing to pursue her remaining claim under Business & Professions Code § 17200.

## IV.  CONCLUSION

Defendants' motion is GRANTED.


IT IS SO ORDERED.